**SCADIF, S.A., a foreign corporation,
Plaintiff,**

v.

**FIRST UNION NATIONAL BANK, a
national banking association,
Defendant.**

No. 98–2868–CIV.

United States District Court,
S.D. Florida,
Miami Division.

July 5, 2002.

Alvin F. Lindsay III, Esq., Steel, Hector & Davis LLP, Miami, FL, for SCADIF, S.A.

Stephen Gillman, Esq., Gallwey, Gillman, Curtis, Vento & Horn, P.A., Miami, FL, Virginia B. Townes, Esq., Akerman, Senterfitt & Eidson, P.A., Orlando, FL, for First Union National Bank.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HOEVELER, District Judge.

Pursuant to the requirements of Fed. R.Civ.P. 52, the following facts and conclusions of law are made. In this case, SCADIF, S.A. ("SCADIF"), has sued First Union National Bank ("First Union"), alleging that First Union is strictly liable to SCADIF in the amount of $3,215,083 because First Union failed to pay or return a check for that amount before the midnight deadline imposed by section 674.302, Florida Statutes. During a six-day bench trial, which began on December 13, 2001, this Court heard the evidence, considered the law and the arguments before it, and now finds that SCADIF sent the check for collection rather than for payment and that the midnight deadline rule contained in section 674.302 does not apply to this transaction. Inasmuch as the Court further finds that First Union's handling of the item did not cause SCADIF any loss or injury, the Court grants judgment in First Union's favor for the reasons set forth in the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

#### The Parties

1. Plaintiff SCADIF is a business formed under the laws of France with offices located only in France. SCADIF is a buying cooperative that purchases and supplies goods to twenty-two Center Le-Clerc hypermarket[1] stores in the region of Paris, France. See Joint Pretrial Stipulation, Statement of Uncontested Facts, ¶ 1 (hereinafter "PTS ¶ 1"). SCADIF had a continuing commercial relationship with Banque Francaise de Credit Cooperatif ("Banque Francaise"), a bank formed under the laws of France. See PTS ¶ 3; test. of M. Fosset. Banque Francaise has no operations in the United States, but during the relevant time period it maintained a correspondent relationship with CitiBank of New York. See PTS ¶ 3, 26

2. In 1998, First Union National Bank of Florida was a national bank incorporated under the laws of the United States. See PTS ¶ 2. At all relevant times, First Union had an International Operations Department ("International Operations") located in Miami, Florida, that processed checks sent to First Union for collection by a non-United States bank. First Union had a number of branches in Florida in 1998. See PTS ¶¶ 27–31; test. of J. Thompson, S. Gray; Pl's Ex. 104, ¶ 4. Banque Francaise did not and does not maintain any account with First Union. See PTS ¶ 3.

### SCADIF's Acquisition of Parapharmaceuticals

3. In the early 1990's, the Center Le-Clerc stores wanted to sell parapharmaceuticals[2], although French law prohibited sales of such goods by any retail outlet which was not a licensed pharmacy. The law prohibited French manufacturers of

---

1. A hypermarket store is one which sells a wide variety of goods at discount prices, similar to a Sam's Club or a Walmart in this country.

2. Parapharmeceuticals are non-prescription medicines and medical supplies.

parapharmaceutical products from selling the products for resale in France other than through a licensed pharmacy. Because the Center LeClerc stores were not licensed pharmacies, there was a legal question as to whether they could purchase such products, so SCADIF arranged to purchase parapharmaceuticals from a non-French company, I.Tra.S, who in turn purchased the products from French laboratories by suggesting that the goods were to be resold outside of France. Over a period of several years, SCADIF purchased and warehoused more than three million dollars worth of the products in this manner. *See* PTS ¶¶ 5–6; test. of M. Thibault, Pl's Ex. 67/Def.'s Ex. 1 [3]

### SCADIF'S Resale to I. TRA.S

4. In 1996, Centre LeClerc decided that it would not be able to sell the products in the French stores. SCADIF somehow convinced I.Tra.S to repurchase those pharmaceuticals whose selling date had not expired at their original price despite the fact that some of the products had a limited shelf-life so their market value must have been depressed by the passage of time. On top of that, I.Tra.S. agreed to reimburse SCADIF for its costs of shipping and warehousing. *See* PTS ¶ 7; test. of M. Thibault; PX67/DX1.

5. Although it had agreed to purchase the goods and to pay SCADIF its related costs, I.Tra.S was without funds to make the required payment. I.Tra.S obtained a loan from a Swiss bank with which to pay SCADIF after SCADIF obtained a guarantee of the I.Tra.S loan from Banque Francaise (the "Swiss Loan"). SCADIF, in turn, guaranteed Banque Francaise's obligation under its guarantee to the Swiss bank. *See* PTS ¶ 8; Test. of Messrs. Thibault and Fosset; PX74/DX2; PX73/DX2.

### I. TRA. S' Loan from Ameriplex

6. Notwithstanding its payment to SCADIF, I.Tra.S simply transferred the parapharmaceuticals to a warehouse and never sold any of the products. *See* PTS ¶ 6; Test. of M. Thibault. I.Tra.S, in an attempt to obtain funds for various projects and obligations, including its obligation to repay the loan which was used to pay SCADIF, obtained a loan commitment from a Canadian corporation, Ameriplex Group, Inc. ("Ameriplex"), which had its office in Weston, Ontario, Canada. In November of 1997, Ameriplex agreed to lend I.Tra.S $25,343,000. *See* DX6. The source of the funds Ameriplex agreed to lend was to have been a separate loan Ameriplex purportedly arranged to obtain from an undisclosed third-party lender. *See* PX91/DX20.

7. However, no confirmation was provided that Ameriplex ever had access to any funds or any ability to make the loan to I.Tra.S and Ameriplex never funded the loan to I.Tra.S. In 1998 or earlier, Ameriplex commenced a series of contacts with SCADIF and/or Banque Francaise promising imminent funding to I.Tra.S, but making excuses for non-performance. *See* PX 91/DX20; PX92/DX21; PX82/DX22; PX84/DX23; PX 65/DX24; PX80/DX25; PX85/DX26; DX27. By letter dated January 12, 1998, Ameriplex notified Banque Francaise that the promised first funding of the loan had been delayed by "unforeseen changes to legal documents ... that is beyond our control." Ameriplex copied SCADIF on this letter. *See* PX90/DX11.

---

**3.** Hereinafter, Plaintiff's Exhibits will be identified as PX# and Defendant's Exhibits as DX#. Where both parties introduced the same exhibit, the exhibit will be cross referenced, as here, by both PX# and DX# , separated by a slash—, *e.g.* PX67/DX1

8. Ameriplex did not fund the loan to I.Tra.S and I.Tra.S was unable to pay off the Swiss Loan. On January 31, 1998, Banque Francaise had to pay its guarantee of the Swiss Loan and debited SCADIF's account for the amount Banque Francaise paid. *See* PX79/DX15. Between January 31, 1998, and April 1998, efforts to obtain funding of Ameriplex's loan commitment to I.Tra.S had not been successful. On April 3, 1998, Ameriplex sent a post-dated check (dated April 14, 1998) to SCADIF (the "check"). It is the check which is the subject of this litigation.

9. While Ameriplex was a Canadian corporation and all of SCADIF's, Banque Francaise's, and I.Tra.S's dealings with Ameriplex were from and to Canada, the check was drawn on a Florida account. The check was a starter check for a new account opened and maintained at branch 273 of First Union in Sarasota, Florida. *See* PX 104, ¶ 3; Test. of D. Turner, Dec. 12, at 101:21–25. The check was not imprinted with Ameriplex's name or address; the name "Ameriplex Group, Inc.," had been typed on. The check was not imprinted with a check number; it was hand-numbered as "0002." There was a discrepancy between the numeric and the word amount on the check. Neither the street address nor name of the specific First Union branch (i.e. "St. Armands branch") was printed on the check. The memo line on the check indicates that it was for "Phamaceutical [sic] Products," apparently a misspelling of "pharmaceuticals." The check was handwritten. *See* PX1/DX18.

10. Along with the post-dated check, Ameriplex sent a letter stating that the check was provided "on the strict conditions and mutual understanding that it is to be held and not presented for payment."

*See* PTS ¶ 12; PX64/DX18. From receipt of the check until July 20, 1998, three and one-half months later, SCADIF complied with that condition and understanding. SCADIF did not seek to deposit or collect the check, nor did it account for the check on its books. SCADIF locked the check in its safe for those three and one-half months. *See* Test. of M. Thibault.

11. Peter Giannotti, the president of Ameriplex, had opened the account at the St. Armands branch of First Union, in Sarasota, Florida (the "account"). The First Union relationship manager for the Ameriplex account was Hope Griffiths. *See* PX97; DX19. On April 21, 1998, Ameriplex sent Hope Griffiths at the St. Armands branch a written stop payment order on the check. *See* PX20/DX19. There were insufficient funds in the account in July. To the contrary, the highest average daily balance in the account was $3.83, obviously an insufficient amount to cover the check. *See* DX17; Test. of S. Gray, Dec. 11, at 81:18–20.

12. Thereafter, efforts to obtain funding of the Ameriplex loan continued, but Ameriplex sent excuses for its inability to deliver the promised funds and failed to meet its promise to exhibit proof of funds. By letter dated May 5, 1998, Ameriplex notified Banque Francaise that Ameriplex's unidentified lender had attempted to transfer funds to Ameriplex's account, but that the Federal Reserve had placed a hold on the funds transfer. *See* PX91/DX20. Banque Francaise notified SCADIF of this communication. *See* Test. of M. Fosset, Dec. 7, at 81:15–21; Test. of M. Thibault, Dec. 6, at 54:11–15. At this point, both Banque Francaise and SCADIF had reason to suspect that Ameriplex did not have funds to back the post-dated check and that the check would not be

good until and unless Ameriplex obtained funds from its lender. *See* Test. of M. Thibault, Dec. 6, at 52:15–23, 60:9–13.

13. By letter dated May 11, 1998, Ameriplex notified Banque Francaise that Ameriplex should be able to exhibit proof of funds regarding the I.Tra.S/Ameriplex transaction by May 13, 1998. *See* PX92/DX21. Proof of funds was not provided. Instead, on May 29, 1998, Ameriplex sent a letter to SCADIF stating that "the right of appeal was lifted for the insurance company;" that the loan to I.Tra.S was "following its normal course," and that Ameriplex would be able to give proof of funds on June 2, 1998. *See* PX82/DX22. On June 9, Ameriplex sent a letter to Banque Francaise, with a copy to M. Thibault of SCADIF, stating that the first portion of the loan ought to be transferred to Ameriplex's bank by the end of the day on June 9 and that the I.Tra.S loan would be completed within 10 business days. *See* PX84/DX23. On June 12, Ameriplex sent a letter to I.Tra.S, with a copy to both Banque Francaise and SCADIF, stating that Ameriplex's lender had notified Ameriplex of the "official date" of the advance to Ameriplex and stating that Mr. Giannotti, president of Ameriplex, would arrive in Paris on June 18 and settle Ameriplex's obligations to I.Tra.S. *See* PX85/DX26.

14. Mr. Giannotti did not go to Paris on June 18. The Ameriplex loan to I.Tra.S was never completed. Neither Banque Francaise nor SCADIF ever received information that the loan was completed. Neither Banque Francaise nor SCADIF ever received proof of funds from Ameriplex or its bank. Neither Banque

Francaise nor SCADIF, however, made any effort to determine whether the account contained funds sufficient to cover the check. *See* PX65/DX24; PX80/DX25; Test. of Messrs Thibault and Fosset.

### SCADIF AND Banque Francaise Send the Ameriplex Check for Collection

15. Notwithstanding the prior letters from Ameriplex making questionable the existence of funds to back the check, on July 20, 1998, SCADIF delivered the check to Banque Francaise and instructed Banque Francaise (both orally and in writing) to "collect" the check. *See* PX63/DX28. The letter was directed to Banque Francaise's International Department and expressly "confirm[ed] our telephone conversation of today whereby we instructed you to send for collection the Ameriplex Group, Inc.'s April 14, 1998 check ..." *Id.* The French term used by SCADIF, *"encaissement,"* is the same French term used throughout the French text of the International Chamber of Commerce's Uniform Rule of Collection 522 ("URC 522") to denominate the international collection process as practiced by international banks[4]. *See* DX61.

16. When it received the check, no evidence was introduced that Banque Francaise deposited the check in SCADIF's account, but the parties stipulated that Banque Francaise did not provisionally credit SCADIF's account for the amount of the check and never extended any credit or payment to SCADIF. *See* PTS ¶ 23. Rather, Banque Francaise separated the check from other checks it had received that were drawn on United States banks.

---

4. The Court notes that M. Fosset referred to the French translation of URC 522 during his testimony. However, URC 522 itself expressly designates English as the official language of the rules.

It sent the check individually to First Union via Airborne Express, in a package which also included a form letter that identified the transaction as a "Collection Payable Abroad," stated that the check was being sent for collection, identified Ameriplex as the drawee from whom payment should be obtained, requested advice of payment or notice of reasons for dishonor, and requested payment of Banque Francaise's fees. *See* PX2/DX30; Test. of M. Fosset.

17. The collection letter sent with the check required the receiving bank, First Union, to respond to Banque Francaise by SWIFT ("Society for Worldwide International Financial Telecommunications"). Michel Fosset of Banque Francaise testified that he was aware that the Sarasota branches of First Union did not have SWIFT communication capacity because he was unable to find them in the SWIFT directory. *See* Test. of M. Fosset, Dec. 7, at 53:6–9, 89:3–16. Nonetheless, the collection letter instructed First Union "PLS CREDIT OUR USD ACCOUNT WITH CITIBANK NEW YORK UNDER SWIFT ADVISE MT 999 TO U.S. (CCOPFRPP)." *See* PX2/DX30.

18. The collection letter recognized that First Union would assess fees for providing the collection service, but Banque Francaise instructed First Union to collect the fees it assessed for the service from the drawee, Ameriplex: "Your charges due by drawee." The collection letter further demanded payment of Banque Francaise's fees of $100. M. Fosset testified that he knew and understood that

Banque Francaise's fees would not be paid from First Union's funds, but would be paid from funds collected from the drawee Ameriplex. *See* Test. of M. Fosset, Dec. 7, at 59:10–15. First Union could collect neither its fees nor those demanded by Banque Francaise without the authorization of Ameriplex, the account holder to be charged. *See* Test. of J. Thompson, Dec. 10, at 144:5–8, 145: 18–25; test of S. Gray, Dec. 11, 2001, at 116:25–117:14. Thus, on the face of the collection letter, Banque Francaise implicitly directed First Union to consult with Ameriplex concerning compliance with the collection letter.

19. M. Fosset testified that Banque Francaise intended to send the collection package to the branch where the Ameriplex account was maintained. *See* Test. of M. Fosset, Dec. 7, at 83:16–84:13. He also testified that he was aware that many banks in America operated through a number of branches. *Id.* at 85:14–16. Despite the fact that the check identified the branch where the account on which the check was drawn as branch 273 and that M. Fosset was aware that U.S. banks have street addresses, he made no effort to identify the branch at which the Ameriplex account was maintained or to locate its street address. *See* PX1/DX30; PX104 at ¶ 3; Test. of M. Fosset, Dec. 7, at 85:1–2, 84:23–85:7. Banque Francaise sent the $3.2 million check and collection letter addressed only to "First Union National Bank of Florida, Sarasota Florida 34236," without any street address[5]. *See* PTS ¶ 25.

20 At that time, First Union National Bank had multiple branches in Sarasota,

---

5. Banque Francaise's International Department, which handled the collection for SCAD-IF, could have communicated with First Union's International Operations Department by SWIFT to determine the address of branch

273. Banque Francaise's International Department was also aware that it could have forwarded the check to First Union's International Operations. *See* Test. of M. Fosset, Dec. 7, at 85:17–22. ·

Florida. Two of the branches were in the 34236 zip code. *See* PX 104 ¶ 2. Branch 273 was the St. Armands branch, at which Ameriplex opened the account. *See* Test. of D. Turner; Dec. 12, at 101:21–25; PX104 at ¶ 3; DX 17; PX19/DX36. The other branch was the City Center branch. The branches operated separately; both took deposits, paid checks, and made loans. *See* Test. of D. Turner, Dec. 12, at 102:1–14. Because the address on the Airborne Express routing slip had no street address and there were at least two First Union branches in zip code area 34236, the messenger service must have had to select which of the First Union branches was the addressee. Airborne Express delivered the check and the collection letter to the City Center branch, rather than the St. Armands branch where the Ameriplex account was maintained.

21 Also on July 20, 1998, Banque Francaise forwarded the other checks it·had received that were drawn on United States banks along with a cash letter [6] to its correspondent bank, CitiBank of New York, for deposit and processing through the Federal Reserve System. *See* PTS ¶ 26; Test. of M. Fosset; DX31. Notwithstanding the availability of the correspondent relationship with CitiBank and its handling other items through the correspondent, Banque Francaise elected not to process the check through the Federal Reserve System.

22 Airborne Express delivered the check to the City Center branch on July 24, 1998. *See* PX12. The check was not processed by the City Center branch be-cause the proper place for this check to be processed was in the International Operations department. *See* PX104 ¶ 6 & ¶ 7; Test. of S. Gray, Dec. 11, at 11:7–25, 72:1. There is no evidence establishing why the check and the collection letter were not forwarded to International Opeartions, but there is no evidence that First Union acted in bad faith nor does the delay appear to have benefitted First Union in any way. The delay appears to be attributable to human error.

23 On July 30, 1998, Banque Francaise sent a SWIFT inquiry to First Union's International Operations in Miami, Florida, again identifying Ameriplex as the drawee of the check and inquiring as to the "fate" (an industry term requesting advice as to whether a collection item was paid or not) of the check. *See* PTS ¶ 27; PX3/DX32; Test. of M. Fosset, Dec. 7, at 91:24–25 to 92:1–9; Test. of S. Gray, Dec. 11, at 122:12–15. The next day, July 31, 1998, Banque Francaise again sent a SWIFT inquiry to First Union's International Operations in Miami, Florida, with essentially the same information. *See* PTS ¶ 28; PX4/DX33.

24 On August 5, 1998, the check and collection letter were located at the City Center branch and overnighted to International Operations in Miami. That same day, First Union's International Operations sent a SWIFT telex to Banque Francaise stating that the check would be delivered to International Operations the following day. *See* PTS ¶ 29; PX5/DX34. The next day, August 6, 1998, First Union's International Operations notified

---

6. A cash letter is, in international banking, the functional equivalent of a deposit slip. It is printed and provided by the foreign bank's United States correspondent bank. The foreign bank identifies the items being forwarded to the correspondent bank (the "cash items") for deposit into the foreign bank's account and for processing through the United States domestic check clearing system. *See* Test. of S. Gray, Dec. 11, at 109: 12–21, 138:1–19.

Banque Francaise that the check was being returned unpaid because of a stop payment on the item and a discrepancy in the written and numerical amount of the check. *See* PX7/DX37.

25 On August 6, 1998, First Union sent Banque Francaise a "debit advice" by SWIFT and returned the check via Federal Express—an overnight courier service similar to the Airborne Express method chosen by Banque Francaise to send the check and collection letter to First Union. *See* DX37. In that same correspondence, First Union requested that Banque Francaise reimburse it $30 for cable charges. *See* PX9/DX38. Banque Francaise never took issue with the identification of Ameriplex as the drawee of the check or with First Union's reference to the transaction as a collection or a "clean check collection." *See* PX7; DX38; PX5/DX34. Banque Francaise never notified First Union of any protest to the return of the check. Not only did Banque Francaise fail to protest the manner in which First Union handled the transaction, Banque Francaise paid First Union's cable charges associated with the collection processes. *See* DX43.

### International Banking Practices for Processing Checks

26 Just as the Uniform Commercial Code grew out of and reflects commercial practices in the United States, international banks have developed recognized practices that facilitate commerce between and among banks in different countries. *See* Test. of D. Taylor, Dec. 12, at 23:22–25:23, 30:1–18. An international analog to the Federal Reserve System has not been developed in international banking. *See* Test. of S. Gray; Dec. 11, at 110:19–111:11; Test. of J. Thompson, Dec. 10, at 143:24–25; Test. of D.Taylor, Dec. 12, at 32:9–

34:16. Thus, the concepts of conditional settlement of items and finality of payments are not features of international banking. *See* Test. of D. Taylor; Dec. 12, at 57:17–58:16, 34; Test. of J. Thompson, Dec. 10, at 114:10–119:2; 132:17–134:1; 142:20–143:25; Test. of S.Gray, Dec. 11, at 88:7–89:3; PX28; PX 30, ¶ 10.

### a. *Payment*

27 The expert testimony established that a bank in another country has two means of obtaining payment of items drawn on a bank in the United States. *See* Test. of D. Taylor, Dec. 12, at 32:9–33:5. If the bank has a correspondent relationship with a United States bank, it may deposit the items by means of a cash letter. Once the item is deposited in the domestic bank, it is processed like any domestic item. The depositor is given provisional credit and the processing is subject to deadlines imposed by federal regulation or by the Uniform Commercial Code. These deadlines are commercially feasible because the payor bank retains recourse against the parties in the clearance stream, including the depositor, for any breaches of presentment warranties or later discovered frauds or irregularities. *See* Test. of S. Gray, Dec. 11, at 88:1–89:3; Test. of J. Thompson, Dec. 10, at 132:17–134:1. Thus, while the provisional credit is received immediately and the clearance process provides for funds availability within specified times, the payee and the payee's bank are given no assurance that they will not later have the item charged back against their account. *See* Test. of D. Taylor, Dec. 12, at 34:10–16. Additionally, the evidence established that per check fees and charges are not permitted nor are they charged when this method of processing is employed. Instead, the checks at issue are paid at par, i.e., the face amount

of the check is all that is paid. *See* Test. of S. Gray, Dec. 11, at 116: 14–24; 169:19–170:4; Test. of D. Taylor, Dec. 12, at 32:9–23; Test. of S. Langbein, Dec. 10, at 74:7–11; Test. of B. Clark, Dec. 12, at 145: 10–24; PX28; PX30.

#### b. *Collection*

28 If the foreign bank and its customer want certainty and finality of payment, they may send the item for collection, following a procedure developed and adopted by banks around the world who are engaged in international banking. *See* Test. of D. Taylor, Dec. 12, at 35:4–15; 30:1–18. Per check fees and charges are permitted and routinely charged/paid on checks sent for collection. *See* Test. of S. Gray, Dec. 11, at 169:19–170:4; Test. of S. Langbein, Dec. 10, at 73:19–74:6. These procedures are so generally recognized and followed that they have been embodied in URC 522, published by the Commission on Banking Technique and Practice of the International Chamber of Commerce (the "ICC"), and the Collection Rule promulgated by the Council for International Banking (now known as the International Financial Services Association) ("IFSA"). *See* Test. of D. Taylor, Dec. 12, at 23:18–24:3; 25:16–23; PX 26; PX29; DX52. While trade practice among banks processing the collection of checks from different countries is articulated in these rules, the rules memorialize existing and long standing custom and usage of trade among banks. *See* Test. of D. Taylor, Dec. 12, at 24:13–19, 25:6–23; 52:14–53:4; PX28; PX 30.

#### c. *General Policies and Practices*

29 Two fact witnesses called by SCAD-IF in its case in chief, Joseph Thompson and Sheila Gray, represent a combined total of approximately half a century of hands-on experience in international operations, including international collections. *See* Test. J. Thompson, Dec. 10, at 129:22–130:15, Test. S. Gray, Dec. 11, at 103:13–14. Mr. Thompson is currently employed by Union Planters Bank, but he was employed in First Union's International Operations Department in Miami in July and August of 1998; Sheila Gray was and remains an employee of First Union in the International Operations Department. *Id.* They testified that in the course of their careers, they had routinely handled transactions in the same form as the package Banque Francaise delivered to First Union and that all had been handled in the manner recognized and accepted globally by banks engaged in the handling of international collections. *See* Test. of J. Thompson, Dec. 10, at 137:1–138:10, 140:10–141:11, 142:6–19, 146:1–148:21, 149:18–150:13, 153:18–154:10, 155:10–24; Test. of S. Gray, Dec. 11 at 118:5–122:1. Ms. Gray testified that at First Union alone, between 50 to 100 such collections are handled each banking day. *See* Test. of S. Gray, Dec. 11 at 115:23–15. Both testified that regardless of whether the collection documents specifically referenced URC 522, the process for handling the collections is the same. *See* Test. of J. Thompson, Dec. 10, at 149:18–150:13; Test. S. Gray, Dec. 11 at 118:5–119:14.

30 First Union also presented trial testimony from Dan Taylor, an expert witness who is currently the president of the IFSA, a trade group of United States banks engaged in international banking. *See* Test. of D. Taylor, Dec. 12, at 6:7 to 9:12. The IFSA is the United States representative to the ICC, which through the collections committee of the Commission on Banking Technique and Practice, considers collection issues and formulates international rules of collection, including

URC 522 [7]. *Id.* at 7:18 to 9:9.

31 The custom and usage of trade of international bankers engaged in collections and followed by First Union is as follows: A bank that receives from its customer a check (or other draft) payable in another country does not deposit the check to the customer's account. Instead, the bank separately sends the draft for special handling to the bank on which the check is drawn along with a letter of instructions to the receiving bank which the receiving bank is to follow in processing the collection. This form is referred to in international banking parlance as a "collection letter" or a "collection instruction." Over many years, banks engaged in international collections have developed the information to be included in the collection letter which identifies the transaction and the requested processing as an international check collection and defined terms to have particularized meanings. The information included in the collection letter identifies the transmitting bank, provides information concerning the customer who has delivered the item to the transmitting bank (the "Principal"), identifies the person who is responsible for paying the item (the "Drawee"), the identity of the bank to which the draft is being transmitted (the "Presenting Bank"), the amounts to be collected and the currency in which it is to be collected, a list and count of all documents submitted with the draft, terms and conditions imposed on the transaction, charges to be collected, interest to be collected, method of payment and form of payment advice, and instructions in case of non-payment, non-acceptance and/or non-compliance with other instructions. *See* Test. of J. Thompson, Dec. 10 at 114:10–

119:2; 137:1–138:10, 140:10–141:11; Test. of S. Gray, Dec. 11 at 108:14–109:13, 175:2–21; Test. of D. Taylor, Dec. 12, 42:19–43:11, 32:11–13, 36:13–22, 37:2–38:18, 54:2–55:5.

32 When a Presenting Bank receives a check (or other "financial document") accompanied by a collection letter but without commercial documents, the transaction is defined in the industry as a "clean collection." *See* Test. of J. Thompson, Dec. 10, at 123:13–21; Test. of D. Taylor, Dec. 12, at 42:19–43:11. Of particular application here, under the custom and usage of trade among such banks and the express terms of the collection letter here at issue, the draft is sent for collection from the party named as drawee in the collection instruction and not from the bank on which the draft is drawn. *See* Test. of J. Thompson, Dec. 10, at 144:1–8; Test. of D. Taylor, Dec. 12 at 55:25–56:17. Under international bank custom and usage of trade, a Presenting Bank must act on the instructions it receives within a reasonable time. *See* Test. of J. Thompson, Dec. 10, 2001, at 156:24–158:4. If the Presenting Bank fails to act within a reasonable time, it is not strictly liable for the face amount of the item; rather, it is liable for any prejudice to the sender which results from the unreasonable delay. *See* Test. of J. Thompson, Dec. 10, at 142:25–143:1, 143:18–23; Test. of D. Taylor, Dec. 12, at 55:10–14, 57:17–58:16. The benefit to the payee and its bank is that they are able to obtain the desired finality of payment because the drawee itself must acknowledge the obligation represented by the check and authorize its payment. *See* Test. of S. Gray, Dec. 11, at 120:12–122:1; Test. of D. Taylor, Dec. 12, at 35:1–15.

7. The Ryan affidavit, introduced by SCADIF corroborates and affirms the trial testimony of Mr. Thompson, Ms. Gray, and Mr. Taylor. *See* PX30.

33 Other than depositing the item by cash letter or sending the item for collection, international banking has developed no other mechanism for obtaining payment of checks. There is no recognized or established means by which a foreign bank may present an item for immediate payment as contemplated by the Uniform Commercial Code. *See* Test. of J. Thompson, Dec. 10, at 132:17–134:1; Test. of S. Gray, Dec. 11, at 104:23–106:23; 88:7–90:8; Test. of D. Taylor, Dec. 12, at 31:2–33:5.

34 No evidence was presented which contradicted First Union's factual and expert testimony that the practice First Union followed in handling the check and the collection letter once the package arrived in International Operations reflects the established usage of trade between and among banks handling international collections[8]. Plaintiff's expert, Stanley I. Langbein, a professor of law whose primary area of expertise is international taxation of financial institutions, candidly disavowed all knowledge of practices and usages of trade in international banking. *See* Test. of S. Langbein, Dec. 10, 20:16–21:4, 69:3–75:13. The purpose of his testimony was to express his opinion that the provisions of the Uniform Commercial Code establishing the relationship of the parties to a check could not be varied by custom and usage of trade and, as a consequence, cus-tom and usage of trade in international banking could not vary the applicability of the midnight deadline rule. That testimony was countered by Professor Barkley Clark— who Professor Langbein acknowledged is a nationally recognized expert on the Code and check collections. *See* Test. of S. Langbein, Dec. 10, at 163:2–25.

35 In contrast, the evidence adduced by First Union's fact and expert witnesses establish that banks engaged in international banking have established a practice and usage of trade in transactions of the nature here before the Court which is not subject to the midnight deadline rule and gives presenting banks a reasonable time to pay or to return the item.

36 I find that First Union has established by the preponderance of the evidence: (1) the existence of the above described practice and method of dealing with international collection of checks; (2) that this practice and method has such regularity of observance in international banking as to justify an expectation that it will be observed with respect to the transaction in question; (3) that bankers in Florida and the United States who engage in the processing of checks sent by banks in other countries act in conformity with this custom and usage of trade[9]; and (4) that First Union acted under this custom

---

8. To the contrary, SCADIF moved the admission of affidavits from First Union's international practices experts, Dan Taylor and John Ryan which confirm the established usage of trade recognizing that practice. *See* PX28; PX30

9. While the evidence establishes the custom and usage of trade in international collections followed by the United States and non-United States banks, the custom and usage of United States banks engaged in international banking is most directly relevant here because First Union is a United States bank and perfor-mance of the check collection was to occur in Florida. Fla. Stat. § 671.205(5) ("an applicable usage of trade in the place where any part of performance is to occur shall be used in interpreting the agreement as to that part of performance"). The evidence that non-United States banks follow the same practice and usage of trade is merely confirmatory of the international collection practices followed by banks in the United States. The evidence established that in Florida (and the United States) a check and collection letter received together in the manner as in the present case, from a foreign bank is a clean check collec-

and usage of trade and correctly understood that the check was sent by Banque Francaise for collection from the named drawee, Ameriplex.

37 Both SCADIF and Banque Francaise established through their own testimony that they are sophisticated participants in international transactions. Banque Francaise, in particular, is chargeable with knowledge of the usage among international bankers located in Florida and the United States—the place where performance was to occur—in the collection of items payable abroad. Banque Francaise's awareness of the usage of trade is further evidenced by the fact that it sent a form collection letter with the check, that the form collection letter identified the subject transaction as a "Collection Payable Abroad" and included every item required for a clean collection within the established usage of trade among international bankers. Moreover, the conditions Banque Francaise imposed on the handling of the check, including requests for notice of the fate of the check, the demand for payment of its fees and the direction to First Union to obtain payment of its own fees from Ameriplex, are features by which bankers experienced in international collections recognize an item sent for collection; but they are entirely inconsistent with an item sent for payment. I find that the

check was forwarded to First Union as a clean check collection and not presented for payment.

### SCADIF Did Not Suffer Any Prejudice From Any Processing Delay

38 Because Ameriplex had placed a stop payment on the Check prior to the time First Union received the Check and the form collection letter, SCADIF would not have been able to collect on the Check had it been processed immediately upon receipt. *See* Test. of S. Gray, Dec. 11, at 81:10–82:5. Thus, any delay on First Union's part, whether reasonable or not, did not cause any loss to SCADIF. *See* DX48.

39. Any of the foregoing factual findings which may represent conclusions of law are adopted as conclusions of law.

### CONCLUSIONS OF LAW

#### PAYMENT OR COLLECTION: THE FLORIDA UCC

 SCADIF contends that the Check was presented to First Union for payment by Banque Francaise's sending the Check via Airborne Express with the collection letter, and that First Union was bound to pay or return the item to Banque Francaise by midnight of the next banking day following receipt of the Check.[10] SCADIF's analysis is founded in the opinion of

---

tion to be processed in accordance with the instruction in the collection letter.

10. The midnight deadline rule is codified at section 674.302, Florida Statutes:

674.302 Payor bank's responsibility for late return of item.—

(1) If an item is presented to and received by a payor bank, the bank is accountable for the amount of:

(a) A demand item, other than a documentary draft, whether properly payable or

not, if the bank, in any case in which it is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, whether or not it is also the depositary bank, does not pay or return the item or send notice of dishonor until after its midnight deadline; or

(b) Any other properly payable item unless, within the time allowed for acceptance or payment of that item, the bank either

its expert, Professor Langbein, who testified that Article 4 of the Code recognizes only two categories of items—demand items, which are subject to the midnight deadline rule and documentary drafts, which are governed by part V of Article 4. Professor Langbein expressed his view that inasmuch as the Check and collection letter do not fall into the definition of documentary draft set forth in section 674.104(f), Florida Statutes, the Check could only have been recognized under Florida law as a demand item, subject to the midnight deadline and strict accountability rule of section 674.302(1)(a).

The Court is persuaded otherwise by the Code, the case law and the testimony of Barkley Clark, a much published [11] and widely recognized expert on the law of bank collections and the UCC [12]. Professor Clark testified that Article 4 of the Uniform Commercial Code, as adopted in Florida, recognizes a third category of items subject to Article 4—collection items which are not accompanied by commercial

documents. *See* PX44 at ¶ 5; Test. of B. Clark, Dec. 12, at 140:13–142:23. Although the term "demand item" is not defined in Florida Statutes, section 674.104(1)(i) defines an "item" as "a promise or order to pay money handled by a bank for collection or payment." *See* Test. of S. Langbein, Dec. 10, at 166:24–167:1. Nothing in that definition limits the ability of a bank to handle an order to pay as an item for collection. In fact, Professor Clark testified that in the banking industry, a check sent with instructions for collection is known as a "clean collection," a routine and recognized practice in modern banking [13]. *See* PX44 at ¶ 5–7; Test. of B. Clark, Dec. 12, at 140:13–142:23, 143:14–148:23.

■ Inasmuch as an item sent to a bank for collection is not presented to the bank for payment, by operation of the definitional provisions of section 674.105, Florida Statutes, a bank receiving a check for collection is not a payor bank, but rather a collecting bank. Section 674.302(1) specifi-

accepts or pays the item or returns it and accompanying documents.

(2) The liability of a payor bank to pay an item pursuant to subsection (1) is subject to defenses based on breach of a presentment warranty (ss.674.2081) or proof that the person seeking enforcement of the liability presented or transferred the item for the purpose of defrauding the payor bank.

The "midnight deadline" is defined in section 674.104(1)(j), Florida Statutes, as midnight of the next banking day following receipt of the item.

11. With his wife, Barbara, Professor Clark is the co-author of *The Law of Bank Deposits, Collections and Credit Cards,* a treatise the Clarks supplement three times a year.

12. Professor Clark is currently both a practicing lawyer with thirty-five years experience advising banks and other depository institutions regarding commercial law issues, including all aspects of domestic and interna-

tional check collection, and a professor of law at the Georgetown Law Center in Washington, D.C., where he teaches an advanced course in "payment systems." *See* PX44 at ¶ 2.

13. Professor Clark's opinion is supported by the Florida Banking Code. As Professor Clark testified, one hallmark of a clean collection is the assessment of fees by the collecting bank. Florida law prohibits assessment of fees on checks sent for payment, but fees can be assessed on checks sent for collection. *See* Test. of B. Clark, Dec. 12, at 145:1–24.

Settlement of checks.... [A]n institution may not settle any check drawn on it otherwise than at par. *The provisions of this section do not apply with respect to the settlement of a check sent to such institution as a special collection item.*

§ 655.85, Fla. Stat. (emphasis added); *Id.*

cally limits its application of the midnight deadline and strict accountability rule to payor banks. Thus, a bank receiving an item for collection, including a check, is not subject to the midnight deadline rule.

■ Florida case law supports Professor Clark's analysis. *Bank of Miami v. Banco Industrial Y Ganadero Del Beni, S.A.,* 515 So.2d 1038 (Fla. 3d DCA 1987) [14], a case factually similar to the case here before the Court, implicitly recognized that under Florida law checks may be sent to the bank on which the check is drawn for collection and not for payment. In that case, a foreign bank sent checks totaling $2,000,000 directly to the bank on which the checks were drawn rather than· presenting them through the regular banking channels. The checks were neither honored nor returned by midnight of the next banking day after receipt of the items. Based on that fact, the trial court held Bank of Miami accountable for the face amounts of the checks and entered summary judgment in favor of the foreign transmitting bank. The appellate court reversed, finding that a factual issue remained as to whether the items were submitted for payment or for collection.

■ The Third District Court of Appeal provided a thoughtful analysis of the reasons for treating collection items and payment items differently:

The distinction between "demand" and "collection" items is this: a demand item is presented for immediate payment, while a collection item is one which is

delivered to a bank with the understanding that the bank will pay upon the item if and when sufficient funds are deposited in the drawer's account to cover the check. The midnight deadline rule ... is, therefore, entirely inconsistent with the collection process under which a bank accepts a check with the understanding that it is to be held until sufficient funds come into drawer's account allowing for the payment of the check.

515 So.2d at 1040.

The Third District also quoted with approval the reasoning of New York's highest court in *David Graubart, Inc. v. Bank Leumi Trust Co.,* 48 N.Y.2d 554, 423 N.Y.S.2d 899, 399 N.E.2d 930, 935–36 (1979):

[T]he concept of a midnight deadline is not compatible with any approach under which the payor bank seeks to wait for the deposit of funds in the drawer's account. The reasonableness of such a banking custom must, therefore, be measured on its own terms. We conclude that this criterion is met when a depository bank takes a possibly worthless instrument and directs the payor bank to adopt a technique that may provide the only chance for collection.

Professor Clark testified that the check and the collection letter transmitted with it are readily recognized in the banking industry and under Florida law as a "clean check collection" which is not subject to the midnight deadline rule. This Court agrees that the evidence adduced at trial and the applicable law fully support Pro-

---

**14.** The Supreme Court of Florida has not ruled on this issue, nor has any other Florida appellate court. This Court recognizes that Florida's district courts of appeal are courts of final jurisdiction and this Court is bound to follow a district court's interpretation of Flor-

ida law if there is no conflict among the districts. *See Insurance Company of North America v. Lexow,* 937 F.2d 569, 571 (11th Cir.1991); *Silverberg v. Paine, Webber, Jackson & Curtis, Inc.,* 710 F.2d 678, 690 (11th Cir.1983).

fessor Clark's opinion that the Check and collection letter together constituted a submission for collection not subject to the midnight deadline rule of section 674.302, Florida Statutes.

## PAYMENT OR COLLECTION: THE "FOUR CORNERS" RULE

■ In a further attempt to avoid the fact that consideration of all aspects of this transaction tends to show that it was a "collection," SCADIF argues that in determining the nature of the transaction, the Court can only consider information appearing on the face of the Check itself. SCADIF argues that under the Code, First Union was the drawee of the Check and therefore subject to the midnight deadline rule.

SCADIF contends that the Court, like First Union, may consider only the face of the Check to determine the roles of the parties, the nature of the transaction (international clean check collection or presentment for payment) and the applicability of the midnight deadline rule. In support of its position, SCADIF relies on several cases, including one from the Middle District of Florida, *Gathercrest Ltd. v. First American Bank and Trust*, 649 F.Supp. 106 (M.D.Fla.1985), *aff'd on other grounds*, 805 F.2d 995 (11th Cir.1986); and one from the Supreme Court of New Mexico, *Engine Parts, Inc. v. Citizens Bank of Clovis*, 92 N.M. 37, 582 P.2d 809 (N.M. 1978). Each of these cases applies what has become known as the "four-corners" rule, which SCADIF urges the Court to apply here. That rule, as applied by the cited cases, looks to only the information on the face of the item itself to determine the status of the parties [15] and the nature of the transaction [16].

15. *Gathercrest* is actually internally inconsistent. While it adopts the four-corners rule, it also states *"From the exhibits, trial testimony and reasonable inferences*, the Court concludes that the bill was drawn against MSB, and the subsequent transmittal letters were in error." *See Gathercrest Ltd.*, 649 F.Supp. at 111 (emphasis added). In other words, the Court announced the four-corner rule but then failed to follow it. It examined the entire record and decided that the transmittal letters were in error. For instance, in *Gathercrest*, there were obvious unrelated errors (misspellings) in the transfer letters, and testimony revealed that this was because the bills themselves are inspected while the letters are not. Thus, the bills were more reliable. *Id.* at 111. In the present case, the check contained at least two obvious errors and there was no evidence presented regarding the level of inspection the check went through. Furthermore, in the present case, an examination of the entire record makes it clear that the check was a collection item.

16. Another of the cases SCADIF relies on, *Kane v. American National Bank & Trust Co.*, 21 Ill.App.3d 1046, 316 N.E.2d 177 (1974),

deviates from the "four corner" rule SCADIF argues it enunciates. In that case, the check was accompanied by "an instruction requesting immediate return if not paid." *Id.* at 1050, 316 N.E.2d 177. The court there found that while the transmittal form said "collection," the instructions confirmed the demand for immediate payment. The court clearly looked at the instructions and not just the check in reaching its decision. "American does not make the argument...that sending checks directly 'for collection' to the payor bank, by normal banking practices, is understood to authorize or permit the payor bank to hold such checks beyond the midnight deadline rule...Because American was instructed to return the checks at once if not paid, the argument, if made, could not succeed in any event." *Id.* at 1051, 316 N.E.2d 177 n5.

Similar facts distinguish *Farmers Co-op. Livestock Market, Inc. v. Second National Bank of London*, 427 S.W.2d 247 (Ky.1968). In that case, the instructions sent with the item also demanded immediate notice of dishonor "if unpaid upon arrival." *Id.* at 248. The court noted that "[h]ad appellee wired *as instructed*, it would have discharged its duty

SCADIF's contention that neither the Court nor First Union is permitted to consider the fact that the collection letter named Ameriplex as the drawee is negated by the Third District's holding in *Bank of Miami*, which was decided after *Gathercrest*. *Bank of Miami* is directly at odds with the "four corners" rule advocated by SCADIF. The items submitted to the Bank of Miami were also checks. Nonetheless, the appellate court remanded for a factual finding, based on consideration of other circumstances surrounding the transaction, to determine whether the checks had been submitted for payment or for collection. If the appellate court had applied the "four corners" rule, the factual issue could not have arisen, as a check is defined in section 673.1041(6), Florida Statutes, as a "draft, other than a documentary draft, payable on demand."

The facts here before the Court fit squarely with the considerations recognized in *David Graubart*, which the Third District cited with approval in *Bank of Miami*. SCADIF knew that Ameriplex delivered the Check post-dated and without funds in the account on which it was drawn. Nonetheless, SCADIF held the Check for several months. During that time, Ameriplex breached numerous promises to exhibit proof of funds and, in fact, never exhibited such proof. SCADIF therefore had every reason to believe that the Ameriplex account never contained funds adequate to pay the Check. Banque Francaise also knew or had reason to believe the Check was worthless as it was fully informed about the lack of funds and the broken promises to present proof of funds. When Banque Francaise forwarded the Check to First Union with specific instructions to collect the Check from Ameriplex as the named drawee, it was acting consistently with SCADIF's instructions and the conditions upon which the Check was originally delivered by Ameriplex to SCADIF. The evidence establishes that SCADIF was hoping to realize on a probably worthless instrument, and one which ultimately ended up being worthless, as payment had been stopped on the check.

Notably, in *Engine Parts*, *Gathercrest*, and even in *Bank of Miami*, the parties seeking to impose the midnight deadline rule had actually provided funds or goods to the maker of the draft. Here, SCADIF had provided no funds or goods to Ameriplex. SCADIF had purchased goods from I.Tra.S, and I.Tra.S had agreed to repurchase those goods and to pay SCADIF's expenses related to the goods. I.Tra.S never effectively paid SCADIF. While I.Tra.S arguably owed SCADIF money, Ameriplex owed SCADIF nothing. It certainly did not owe SCADIF the face amount of the Check. Thus, the facts here do not compel any analysis that distinguishes this case from *Bank of Miami*. In light of the fact that binding precedent from the Florida appeals court rejects the "four corners" rule, I find no reason to apply it here.

### USAGE OF TRADE AND THE UNIFORM COMMERCIAL CODE

Considering the Check and the collection letter together is consistent with the

---

as the payor bank ...." *Id.* at 250. Thus, the courts in these cases clearly considered the context of the transaction and the instructions.

At most, these cases stand for the proposition that the use of the word "collection," **when coupled with instructions consistent** **only with payment**, does not convert a presentment for payment into a clean collection. Here, however, the instructions sent to First Union by Banque Francaise were consistent only with collection and antithetical to a demand for payment.

policies underlying the Uniform Commercial Code. Section 671.102 instructs courts to liberally construe and apply the Code to promote its underlying purposes and policies which are "[t]o simplify, clarify, and modernize the law governing commercial transactions" and "[t]o permit the continued expansion of commercial practices through custom, usage and agreement of the parties," as well as to create a uniform body of law among the states adopting the Code. Section 671.102 also explicitly provides that the provisions of the Code may be varied by agreement, unless the Code section sought to be enforced expressly prohibits such variation, a circumstance not at issue here. One commentator, recognized as authoritative by SCADIF's expert witness, has admonished courts making decisions under the Code to "bear in mind the effect that its decision will have on trade" and to choose among alternative decisions that which would further trade. R. Anderson, 1 *Anderson on the Uniform Commercial Code* § 1–102:265 at 180 (3d ed.1996 rev.); Test. of S. Langbein, Dec. 10, at 163:7–22. That same commentator also advises that courts should recognize and protect existing commercial practices so as to make commercial law consistent with the contemporary world of business. In keeping with that advice, courts should "be very reluctant to decide a case in such a way as to disrupt or abolish an established commercial practice." *Id.* at § 1–102:267 at 181–82. This Court agrees.

SCADIF's contentions and interpretations of the Florida Code would require just such a disruption, a disruption that is neither mandated nor warranted by the applicable law or the facts adduced at trial.

The Court has found that a usage of trade exists among banks engaged in international check collections which has provided both flexibility and finality to payees in countries other than that of the bank on which an item is drawn.[17] The evidence establishes that this flexibility and finality would be destroyed by imposition of the midnight deadline rule on these transactions. Banks would be forced to reject or pay items without themselves obtaining certainty of the validity of their actions. The presenting banks would be held strictly accountable for the payment of funds but would lack the ability to seek return of funds paid on defective or fraudulent items. This would encourage-even compel-banks to return unpaid items when they could not verify the item in time to meet the midnight deadline. *See* Test. of S. Gray, Dec. 11, at 175:2–176:12; PX28 at 9.

At First Union between 50 and 100 clean check collections are handled by its international Operations Department every day. In a 200 banking-day year, even at the lower number, First Union alone handles 10,000 international clean check collections a year. The Court recognizes that interpreting the Uniform Commercial Code in a manner which would eliminate an established means by which international business is conducted would be antithetical to the stated purpose of the Code "[t]o simplify, clarify and modernize the law governing commercial transactions [and][t]o permit the continued expansion of commercial practices through custom, usage and agreement of the parties." § 671.102(2)(a) & (b), Fla. Stat.

The Court is also bound by a case decided by the Fifth Circuit prior to the cre-

---

**17.** Michael Fosset of Banque Francaise acknowledged that when checks are sent directly to a bank with a collection letter and the check is paid, it constitutes final payment, without recourse. *See* Test. of M. Fosset, Dec. 7 at 88:24 to 89:2. The same testimony was given by Shelia Gray of First Union. *See* Test. of S. Gray, Dec. 11, at 160:8–13.

ation of the Eleventh Circuit to consider the totality of the circumstances in order to determine the nature of the transaction. *Western Air and Refrigeration v. Metro Bank of Dallas,* 599 F.2d 83, 90 (5th Cir. 1979), rejected the plaintiff's argument that the bank on which the check in question was drawn was subject to the midnight deadline rule when the check had been submitted to the bank for collection. The Fifth Circuit specifically recognized that the parties could vary the applicability of the midnight deadline rule by agreement and even went as far as to state that the code does not require the Court to find an agreement only in "clear circumstances." *Id.* Plaintiff presented the check (normally a demand item) to the bank on which it was drawn, but for collection rather than payment. Thus, an agreement to vary the responsibilities otherwise implicit on the face of the check was given force.

## FLORIDA'S UCC RECOGNIZES THAT CUSTOM AND USAGE OF TRADE MAY VARY THE PROVISIONS OF THE CODE.

█ Florida's version of the Uniform Commercial Code upon which SCADIF relies provides that parties may vary the effect of its provisions by agreement. The Florida Uniform Commercial Code further expressly provides that such agreements encompass "the bargain of the parties in fact as found in their language or by implication from other circumstances *including course of dealing or usage of trade* . . . ." § 671.201(3), Fla. Stat. (emphasis added) Having found that the preponderance of the evidence before the Court establishes the existence of a custom and usage of trade in international banking that defines the term "collection" and recognizes the Check and the collection letter as a unit to be a "clean collection," the Court finds by the words and procedures used and by implication from the custom and usage of trade in international banking, that there was an agreement between Banque Francaise and First Union to handle the transaction as an international clean check collection. That agreement takes the transaction outside the Code's midnight deadline rule. Instead, the Check was to be processed in a reasonable period of time which is not limited to the midnight deadline. Damages may be assessed against First Union only if SCADIF suffered any loss or injury as a result of any unreasonable delay.

Clearly, it is not in the interests of commerce or international banking for the Court to hold that a transmitting bank cannot give instructions to a receiving bank concerning a submitted item. The uncontradicted factual and expert testimony establishes that an enormous volume of international commerce is conducted daily in the United States in reliance on the established usage of trade and that such commerce would be dramatically disrupted by a court's refusal to recognize and apply that usage of trade. If the banks engaged in international banking in the United States are required to apply the midnight deadline rule to transactions such as this one, they will be out of harmony with the remainder of the international banking world. On the one hand, improper rejection of an otherwise collectible item would be unreasonable under the usage of trade in international collections and thus subject the bank to liability for resulting damages. On the other hand, the bank's failure to timely return the item makes the bank strictly accountable for the face amount of the item. This unresolvable dilemma dramatically contravenes the very certainty and efficiency the Code (includ-

ing the midnight deadline rule) is designed to foster. Thia Court agrees with the Court in *Bank of Miami* that a midnight deadline and strict accountability are inconsistent with the collection process and that the process of clean collections is an established and necessary element of international banking and commerce.

In short, I find that the custom and usage of trade in international banking establishes that the Check was sent to First Union for collection from Ameriplex. That same custom and usage of trade relieves First Union of the obligations of a payor bank and makes it instead a collecting or presenting bank, not subject to the midnight deadline rule.

## SCADIF DIRECTED AND IS BOUND BY BANQUE FRANCAISE'S ACTIONS

■ SCADIF contends that regardless of the form of transaction Banque Francaise requested, SCADIF itself was entitled to hold First Union accountable as the payor bank. Notwithstanding its express instructions to Banque Francaise to send the Check for collection, SCADIF contends that it cannot be bound by Banque Francaise's collection letter for two reasons. First, it contends that SCADIF did not intend that the Check be sent for collection and that if Banque Francaise did so, SCADIF is not bound by that error on Banque Francaise's part. As a matter of law, Banque Francaise acted as SCADIF's agent in the handling of the Check. Florida Statutes section 674.201(1) provides that a collecting bank for an item is an agent of the owner of the item until settlement becomes final. Banque Francaise was clearly both the depositary bank [18] and the collecting bank for the Check. *See* § 674.105(2) and (5), Fla. Stat; Test. of B. Clark, Dec. 12, at 151:18 to 153:11. Even if Banque Francaise breached its duty to SCADIF, First Union was entitled to rely on the instructions it received from Banque Francaise with regard to the Check. *See* L. Lawrence, 7 *Lawrence's Anderson on the Uniform Commercial Code,* [Rev] § 4–103:12 at 49–40 (3d ed.2000 rev.).

If SCADIF has been injured by any failure by Banque Francaise to follow SCADIF's directions, its remedy lies with Banque Francaise, not First Union. *See, Federal Reserve Bank of Richmond v. Malloy,* 264 U.S. 160, 44 S.Ct. 296, 68 L.Ed. 617 (1924) (Holding that collecting bank in the clearing stream was responsible to principal of the check for injury caused by collecting bank's failure to follow principal's instructions.)

SCADIF's second defense is that the translation of the collection letter was in error; SCADIF contends that the French word *"encaissement"* is ambiguous and may mean either "payment" or "collection." However, the English word chosen by Banque Francaise was "collection," a word of particular meaning under international banking custom and usage of trade [19] . Banque Francaise made the translation of the collection instruction to First Union

---

**18.** While there was no evidence that Banque Francaise accepted the Check for deposit, Florida Statutes section 674.105(2) defines the "depositary bank" as the first bank to "take" the Check.

**19.** First Union introduced the French language version of URC 522 into evidence.

That translation of URC 522 repeatedly employs only the word *"encaissemant"* to mean "collection" in reference to the usage of trade embodied therein. When the URC discusses payment, it uses the word *"paiment."* *See* DX61.

and must stand behind the translation itself. Moreover, the balance of the collection letter, the procedure through which it was submitted to First Union and other evidence in the record establishes that the intent was to make a clean check collection under industry custom and usage of trade. First Union cannot be charged with responsibility to retranslate documents and to correct errors in translation therein. This is even more obviously the case here, where the transmitting bank chose to send the item to a branch bank rather than to First Union's International Operations.

I find that SCADIF is bound by the actions of Banque Francaise in transmitting the Check for collection. Therefore, as a matter of law, the midnight deadline rule contained in section 674.302, Florida Statutes, does not apply to this transaction.

## THE CHECK WAS NOT DELIVERED TO THE BRANCH AT WHICH THE ACCOUNT WAS MAINTAINED.

■ There is an alternative, but equally sufficient, reason to hold that the midnight deadline rule does not apply. The midnight deadline rule on its face applies only to payor banks. Even if the Check had been presented for payment, section 674.302 applies only to presentments to a "payor bank." Under Florida law, where a bank has multiple branches, each can be a separate bank for midnight deadline purposes and a branch where the account was not opened or maintained is not a "payor" bank for midnight deadline purposes. Here, SCADIF, through Banque Francaise, failed to make presentment to the branch where the Ameriplex account was

opened or maintained and, accordingly the presentment was not to a payor bank.

■ As a procedural matter, SCADIF has argued that this issue is an affirmative defense which First Union waived by failing to raise it in the pleadings. First Union contends that its denial that SCADIF properly presented the Check raises all potential defects in the presentment and that it is not affirmatively required to plead particular facts supporting the denial. One test for whether an issue is a defense, but not an affirmative defense, is whether the issue arises by logical inference from the allegations of the plaintiff's complaint. 5 Wright & Miller, *Federal Practice and Procedure* § 1271 at 442. First Union's denial of SCADIF's allegation that "Banque Francaise proceeded to present the check to First Union for payment" challenged the validity of that statement and included a denial that the item was "presented for payment" and that it was "present[ed] ...to First Union" at the proper place for making a presentment. *See, Hassan v. U.S. Postal Service,* 842 F.2d 260, 263 (11th Cir.1988)("An affirmative defense has been described as '[a]ny matter that does not tend to controvert the opposing party's prima facie case as determined by the applicable substantive law,"' *citing* 2A J. Moore, *Moore's Federal Practice* ¶ 8.27[3] (2d ed.1985)). Having denied SCADIF's prima facie case, First Union was not required to further plead the basis for that denial. Apparently recognizing its burden to produce evidence of a proper presentment, SCADIF introduced evidence on this separate branch issue in its case in chief through a former First Union employee SCADIF called as its witness [20]

20. Even if SCADIF's failure to present the Check at the proper branch were an affirma-

tive defense that should have been raised in the pleadings, the issue was affirmatively as-

*See* Test. of J. Thompson, Dec. 10, at 86:12–103:1.

Turning to the merits, the facts in evidence show that the Ameriplex account was opened and maintained at the St. Armands branch of First Union in Sarasota. The Check was sent to the City Center branch. As a matter of law, for purposes of computing time (i.e. the commencement of the midnight deadline time period), the two branches are separate banks. Section 674.1071, Florida Statutes, states that:

> [a] branch or separate office of a bank is a separate bank for the purpose of computing the time within which, and determining the place at or to which,

action may be taken or notices or orders must be given under this chapter and under chapter 673.

The Florida legislature has defined a "branch" of a bank as "any office or place of business of a bank, other than its main office and the facilities and operations authorized by ss. 658.26(5), 658.65, and 660.33, at which deposits are received, checks are paid and money is lent." The evidence establishes that both the City Center and the St. Armands branches of First Union receive deposits, pay checks and lend money. *See* Test. of D. Turner, Dec. 12, at 102:1–14. Therefore, each is a branch and a separate bank for purposes

---

serted in First Union's Motion for Summary Judgment and in its response in opposition to SCADIF's Motion for Summary Judgment. SCADIF raised this same waiver argument to exclude the issue at that time and the Court rejected that effort. The Joint Pretrial Statement thoroughly sets forth the facts giving rise to the contention that the Check should have been presented to the St. Armands branch rather than to the City Center branch. Absent a showing of surprise or prejudice to the plaintiff, the Court has no reason to hold that an affirmative defense has been waived by failure to plead it in the answer.

In *Hassan*, the Eleventh Circuit noted that "[t]he purpose of Rule 8(c) is simply to guarantee that the opposing party has notice of any additional issue that may be raised at trial so that he or she is prepared to properly litigate it." 842 F.2d at 263. The appellate court went on to rule,

> When a plaintiff has notice that an affirmative defense will be raised at trial, the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice. And, when the failure to raise an affirmative defense does not prejudice the plaintiff, it is not error for the trial court to hear evidence on the issue.

*Id. See also, Miranda de Villalba v. Coutts & Co. (USA) International,* 250 F.3d 1351, 1353 (11th Cir.2001)(Court's permitting party to assert affirmative defense for first time in motion for summary judgment is not error unless opposing party not fairly on notice of de-

fense.); *Pulliam v. Tallapoosa County Jail,* 185 F.3d 1182, 1185 (11th Cir.1999)(Raising issue which should have been pled as an affirmative defense in the pretrial stipulation gave plaintiff sufficient notice of the issue).

SCADIF argues that it suffered prejudice and unfair surprise. However, the evidence that the Ameriplex account was at the St. Armands branch was presented, in part, through the testimony of Ms. Deborah Turner. Ms. Turner's affidavit, which states that the Ameriplex account was at the St. Armands branch, was filed with the Court on March 26, 2001, almost nine months before trial. SCADIF objected to Ms. Turner's affidavit when it was filed in March, and the Court addressed the argument in an Order dated July 1, 2001. In that Order the Court stated "SCADIF argues that Exhibit D, Ms. Turner's affidavit, should be stricken simply because she was never disclosed as a witness in response to SCADIF's interrogatories, despite the fact that her testimony is factual, easily verifiable, and provided more than three months prior to the previously scheduled trial date. The information that she provides appears to be general corporate information ... Should Plaintiff wish to conduct further discovery, or otherwise supplement the record it may file the appropriate motion." July 1, 2001 Order at 15. Moreover, SCADIF cannot claim surprise or prejudice on this record in light of the fact that it addressed the issue, be it a defense or an element of SCADIF's claim, in its case in chief.

of application of the time computations of Chapter 674, Florida Statutes. *See* L. Lawrence, 7 *Lawrence's Anderson on the Uniform Commercial Code*, [Rev] §§ 4–107:5, 4–107:6 at 81 (3d Ed.2000 rev.) (Although branches may not be treated as separate banks for all purposes, they are separate banks for purposes of presentment. Because the branch at which the customer keeps his account may have the signature card and other pertinent information about the customer, presenting the check at another branch of the same bank is not proper presentment.)

SCADIF contends that the proper interpretation of section 674.1071, Florida Statutes, requires the Court to hold that the Check was constructively presented to the St. Armands branch within the City Center branch's midnight deadline, thus compelling the determination that the St. Armands branch failed to meet its midnight deadline. SCADIF derives this theory from an interpretation of the official commentary of the Code provision in question and from a case decided in 1977 by a lower New York court, *Manufacturers Hanover*

*Trust Company v. Akpan*, 91 Misc.2d 622, 398 N.Y.S.2d 477 (N.Y.City Civ.Ct.1977). SCADIF's analysis misconstrues both the commentary and the case. As Professor Clark testified, the commentary and the case both consider sufficiency of *notice* of dishonor of a check, not the requirements for *presentment*. *See* Test. of B. Clark, Dec. 12, at 167:15–169:6. The commentary specifically discusses constructive notice of a stop-payment order; the case determined that the depositary bank lost its right to recoup funds paid over to its customer on a deposited check when the bank failed to notify the customer of dishonor within the midnight deadline after the bank received notice of dishonor.[21]

■ The effect of Banque Francaise's delivery of the Check to the City Center branch, rather than to the St. Armands branch at which the Ameriplex account was opened and maintained, is to make the City Center branch a collecting bank. § 674.105(5), Fla. Stat. A collecting bank is not subject to section 674.302's midnight deadline and strict accountability rule

---

21. New York courts have limited *Manufacturers Hanover* to its specific facts. There, the customer had deposited a check into her account. The check was forwarded to the payor bank the next day; the payor bank returned the check unpaid to the processing center for the payor bank that same day because the maker's funds had been frozen. Three days later, the depositary bank allowed the customer to draw against the returned check. Two days after the customer received funds from the check, the depositary bank was notified by its processing center that the check had been returned. The depositary bank sought to recoup the funds paid out on the check by charging back against the customer's account.

In *Bank of New York v. Asati, Inc.*, 184 A.D.2d 443, 585 N.Y.S.2d 411 (N.Y.App. 1992), the New York appellate court refused to adopt the reasoning in *Manufacturers Hanover*, finding that the result in that case was required by the customer's detrimental reli-

ance on the bank's implicit representation that the check had been honored. "While the court in [*Manufacturers Hanover*] . . . denied the remedy of charge-back for failure to notify the customer by the midnight deadline, 'causation' [was] established because the [collecting bank's] failure led to a detrimental change in [the customer's] position, which change could have been avoided by prompt notification." *Quoting Northpark National Bank v. Bankers Trust Co.*, 572 F.Supp. 524, 530 (S.D.N.Y.1983).

Neither the case nor the commentary confuses notice with presentment. The Court is unwilling to give *Manufacturers Hanover* more weight than appellate and federal courts in the same state have accorded it. Nor is *Manufacturers Hanover* directly on point. SCADIF has admitted that it did not suffer any loss as a result of First Union's actions.

which applies only to payor banks [22]

Collecting banks have obligations to transmitting banks and the payees of items, but that obligation is found in section 674.202, Florida Statutes:

A collecting bank must exercise ordinary care in:

(a) Presenting an item or sending it for presentment;

(b) Sending notice of dishonor or non-payment or returning an item other than a documentary draft to the bank's transferor after learning that the item has not been paid or accepted, as the case may be;

(c) Settling for an item when the bank receives final settlement; and

(d) Notifying its transferor of any loss or delay in transit within a reasonable time after discovery thereof.

That section goes on to provide that a collecting bank acting within its own midnight deadline has acted with ordinary care as a matter of law, but that actions taken within a reasonably longer time may constitute the exercise of ordinary care.[23] The Court need not decide whether First Union exercised ordinary care, as SCADIF did not suffer any damages compensable from a collecting bank.

The measure of damages for which a collecting bank is liable if it fails to exercise ordinary care is set forth in section 674.103(5), Florida Statutes:

The measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount that could not have been realized by the exercise of ordinary care. If there is also bad faith, it includes any other damages the party suffered as a proximate consequence.

The evidence before the Court establishes that Ameriplex had placed a stop-payment on the Check on April 21, 1998, three months before the Check was sent to First Union and that the Ameriplex account never contained sufficient funds to pay the Check. Had the City Center branch processed the Check before its midnight deadline and forwarded it to either the St.

---

22. Even if the Check had been sent for payment and even if delivery to the City Center branch had been proper presentment, SCADIF knew, at least constructively, when it sent the Check to First Union that Ameriplex did not have adequate funds to cover the Check. SCADIF also knew that Ameriplex provided the Check to SCADIF "on the strict conditions and mutual understanding that it is to held and not presented for payment." Ameriplex always intended that any payment I.Tra.S owed SCADIF would be made by I.Tra.S after (and if) the Ameriplex loan was funded. SCADIF's sending the Check for collection from Ameriplex might not have violated the condition under which Ameriplex delivered the Check, but presentment for payment clearly would have; it would constitute a fraudulent presentment, rendered ineffective by application of section 674.302(2), Florida Statutes.

23. "Ordinary care" is defined for purposes of Chapter 674 in section 673.1031, Florida Statutes:

(g) "Ordinary care," in the case of a person engaged in business, means observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged. In the case of a bank that takes an instrument for processing for collection or payment by automated means, reasonable commercial standards do not require the bank to examine the instrument if the failure to examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage not disapproved by this chapter or chapter 674.

Armands branch or to First Union's International Operations in Miami, the stop-payment would have prevented SCADIF's collecting any payment on the Check[24] *See* Tr., Dec. 11 at 81:10–82:8. Thus, the measure of damages in this case is the face amount of the Check, less the amount which could **not** have been recovered if First Union had exercised ordinary care-the total value of the Check. SCADIF has suffered no prejudice or injury as a result of First Union's handling of the Check, regardless of whether that handling constitutes the exercise of ordinary care, a fact SCADIF admitted in response to a request for admissions in the discovery phase of this litigation.

First Union, as a collecting bank, would be liable only for damages which could have been avoided by the exercise of ordinary care in the handling of the item. SCADIF suffered no loss as a result of any delay in First Union's processing the item. Therefore, First Union is not liable to SCADIF.

Any of the foregoing conclusions of law which may represent findings of fact are adopted as findings of fact.

### *Motion For Sanctions*

On March 2, 2002, approximately two months after trial, SCADIF filed a motion for sanctions against First Union based on Fed.R.Civ.P. 26(g) & 37, 28 U.S.C. § 1927 and the Court's implied equitable powers. SCADIF alleges that First Union: (1) failed to give notice of its "separate branch" defense; (2) concealed documents; (3) misrepresented the true role of its ex-

pert Barkley Clark; created evidence; (4) misrepresented facts and engaged abusive deposition conduct. *See* Pl.'s Mem. at 1. The Court held a hearing on May 6, 2002 in which it heard argument on each of SCADIF's allegations.

### I. Standard

Fed.R.Civ.P. 26(g) & 37 discuss sanctions for discovery violations. Rule 37(c) grants the Court the power to impose sanctions for, *inter alia,* a party's failure to disclose information required by Rule 26(a) or 26(e)(1), or a party's submission of false or misleading documents. The Rule states information which is not disclosed, or is false or misleading can not be used at trial "unless such failure is harmless." Moreover, the rule empowers the Court to "impose other appropriate sanctions." Rule 26(g) requires attorneys to vouch for the completeness, truthfulness and good faith nature of disclosures, discovery requests, responses and objections. If a party violates 26(g), the rule empowers the Court to impose "an appropriate sanction." *See* Fed.R.Civ.P. 26(g)(3). Rule 28 U.S.C. § 1927 allows the Court, in its discretion, to impose costs, expenses, or attorney fees on an attorney or person "who so multiplies the proceedings in any case unreasonably and vexatiously." The standard being laid out, the Court will now address the merits of each of SCADIF's arguments.

### 1. Failure to Give Notice of the "Separate Branch" Defense

■ SCADIF argues that it was prejudiced because First Union was allowed to

---

24. If this transaction were not an international check collection exempt from the midnight deadline and strict accountability provisions of section 674.302,Florida Statutes, the receipt by International Operations could argu-

ably start a new midnight deadline. If that were the case, International Operations returned the Check and gave notice of dishonor well within that time period.

assert this defense years into the litigation. First Union brought up this defense for the first time in a supplemental interrogatory response two years after the complaint was filed on November 20, 1998. SCADIF, however, was on notice of the defense for at least seven months before trial. This was certainly enough time for SCADIF to develop an appropriate response to the separate branch defense.

If SCADIF needed more time or discovery to respond to the defense, it certainly could have sought a continuance or additional discovery from this Court, as the Court expressly invited SCADIF to do in July. *See* July 1, 2001 Order at 15. The Court has been very liberal in this case about granting motions for continuances, extensions, and additional discovery. *See e.g.,* Order dated March 11, 1999 (granting extension of time); May 14, 1999 (same); August 12, 1999 (granting leave to file amended complaint); September 20, 1999 (granting extension of time); May 4, 2000 (granting continuance); August 15, 2000 (same); September 14, 2000 (granting extension of time); October 13, 2000 (same); March 29, 2001 (same); April 27, 2001 (same); Order dated June 11, 2001 (granting continuance); August 29, 2001 (granting leave to take depositions). Therefore, the Court finds that SCADIF was not prejudiced by First Union's late raising of this defense.

Moreover, although SCADIF made clear its continuing objection to the defense, SCADIF filed no motion in limine to preclude testimony on the "separate branch" defense. Additionally, during trial, SCAD-IF allowed First Union to present the defense. Thus, SCADIF can not now—two months after trial, expect the Court to sanction First Union for litigating this defense and the Court declines to do so.

## 2. Concealing Documents

SCADIF argues that First Union concealed documents relating to the issue of the identity of Ameriplex's branch at First Union until trial and that it concealed banking procedure documents until the eve of trial. With regard to the account opening documents, First Union admits that it did not disclose these documents during discovery and it attributes this failure to an unintentional omission.[25] First Union has taken responsibility for its mistake, stating "First Union nor its counsel seek to minimize the significance of the omission. SCADIF was entitled to obtain those documents. First Union's Counsel (but not First Union) failed to make a complete production as required by the Federal Rules of Civil Procedure and the Local Rules governing discovery in this case. Counsel for First Union are deeply embarrassed by this failure. We apologize to the Court, to SCADIF, to SCAD-IF's counsel, and to our client." Def.'s Mem. in Resp. to Mot. for Sanctions at 24. Any prejudice suffered by SCADIF as a result of First Union's omission, however, is minimized by the fact that First Union withdrew the documents in response to SCADIF's objections and they were not considered by this Court. *See* Tr., Dec. 12, 161:15–17.

First Union explains, with regard to the other documents which it failed to timely

---

**25.** In Court, counsel for First Union stated that it was his belief that these documents had been produced to SCADIF's former counsel. Now, First Union's counsel accepts SCADIF's representation that the documents were never produced and states that his recollection must have been in error. Based on the entirety of the record, the Court accepts First Union's explanation that its statements were made in good faith and were the result of human error. Therefore, I find that sanctions based on this misstatement would not be appropriate.

produce, that an illness prevented timely disclosure of the internal procedure documents and the policy manuals existed only on a "read-only" computer database. Additionally, First Union argues that the untimely produced documents were not relevant and SCADIF suffered no prejudice. Although First Union's excuses for failing to produce the documents are not acceptable, the prejudice from this untimely disclosure is minimized by the fact that (1) the documents were produced before trial (though barely); (2) SCADIF used the documents to examine and cross-examine witnesses in the trial; and (3) the documents are of minimal relevance. Additionally, although SCADIF argues that it could have better used these documents had they been provided earlier, its Motion for Sanctions, which was filed after at least two months of sitting with the documents, provides little in the way of new arguments from SCADIF, and those few new arguments which SCADIF did propound in its Motion have been considered by this Court.

The Court believes First Union when it asserts that its failure to timely disclose these documents was a good faith error. The Court founds its belief in part on the fact that most of these untimely produced documents were not particularly relevant. There were no "smoking guns." Additionally, First Union's failure to produce the account opening documents led it to voluntarily withdraw those documents, an outcome which potentially may have hurt it more than it did SCADIF.

Nonetheless, a failure to timely produce known, requested and discoverable documents is a serious procedural and ethical violation, and one that can not be dismissed lightly, even where the failure is the result of mere carelessness. This is particularly so where the failure occurs multiple times in the same litigation. Because the Court finds that First Union's failure to timely produce documents was in good faith; First Union has admitted its fault and apologized therefore, and because minimal prejudice was suffered by SCADIF, the Court will limit its sanction of First Union to a written reprimand, as which this opinion shall serve.

### 3. Misrepresentation of Barkley Clark and Creation of Evidence

SCADIF"s argument regarding the misrepresentation of Barkley Clark is threefold. First, SCADIF argues that First Union failed to timely disclose Mr. Clark as an expert witness. However, this matter was already decided in this Court's Omnibus Order, dated July 9, 2001, and the Court will not revisit the issue. Second, SCADIF argues that Barkley Clark improperly served as both an attorney and expert witness in this case, and that this fact was not properly disclosed by First Union. Finally, SCADIF argues that Mr. Clark revised his treatise during the pendency of this litigation in order to create evidence for the trial.

First Union responds that Barkley Clark never served as co-counsel but that he served as a consulting expert before shifting to the role of testifying expert. Moreover, First Union argues that even if Barkley Clark had been co-counsel it would violate no rule of ethics for him to testify at trial. The Florida Rules of Professional Conduct confirm that a lawyer is not prohibited from testifying on behalf of a client but is prohibited from appearing as an advocate in a case in which a lawyer will be giving testimony. *See* Florida Rule of Professional Conduct 4–3.7; *see also* Local Rules of the Southern District of

Florida, Rules Governing Attorney Discipline, Rule I "Standards for Professional Conduct"; *Cerillo v. Highley,* 797 So.2d 1288 (Fla. 4th DCA 2001) (finding that a lawyer who will be a witness at trial is not disqualified from representation but may not try the case); *Columbo v. Puig,* 745 So.2d 1106 (Fla. 3d DCA 1999) (refusing to disqualify a lawyer/witness because of pretrial participation where the opposing party intended to call him as a witness); *Fleitman v. McPherson,* 691 So.2d 37 (Fla. 1st DCA 1997); *Anderson Producing Inc. v. Koch Oil Co.,* 929 S.W.2d 416 (Tex.1996); *Universal Athletic Sales v. American Gym,* 546 F.2d 530 (3d Cir.1976).

While such disclosure is not required by Fed.R.Civ.P. 26(a)(2)(B) and SCADIF does not point to any rule of ethics which so requires, in order to avoid the appearance of impropriety, an attorney should disclose at the time he discloses a particular expert witness, the expert's prior involvement in the litigation, if any. First Union failed to do this. Nonetheless, the Court finds that there was no actual impropriety here and in any case SCADIF suffered no prejudice by First Union's omission, because SCADIF was able to obtain the information and impeach Mr. Clark and First Union at trial.

█ Finally, SCADIF accuses Mr. Clark of "creating evidence" for this case by amending his treatise while consulting with First Union on this litigation. Mr. Clark admits that he amended his treatise while consulting with First Union, but responds that he regularly amends his treatise several times a year, the changes were not substantive and not made for purposes of this litigation. *See* Tr. Dec. 12 at 121:2–122:6; 123:12–124:21; 125:12–23; Dec. 13 17:13–18; 17:19–20:13.

While Mr. Clark's amendments created an appearance of impropriety, there was no actual prejudice because the Court did not rely on Mr. Clark's treatise; First Union never attempted to induce the Court to rely on the treatise; First Union never entered the treatise into evidence; and the Court was aware of the amendments.

Moreover, Mr. Clark was extensively examined by SCADIF, giving the Court a full opportunity to evaluate his credibility. Based on his testimony, the Court finds that any changes Mr. Clark made to his treatise reflected his good faith and impartial evaluation of the law. While amending these sections of his treatise during the pendency of this litigation was certainly a lapse in judgment, the Court does not believe Mr. Clark risked his reputation and the reputation of his treatise for the consulting fees in this particular case.

SCADIF asks this Court to strike the testimony of Mr. Clark, however it filed no motion in limine to preclude his testimony. Additionally, SCADIF stated it had no objection to the testimony of Mr. Clark before he took the stand. *See* Tr. Dec. 12 at 126: 18–22. If that were not enough, SCADIF reserved its right to assert an appropriate motion "right after the testimony" of Mr. Clark, but never made such a motion. *Id.* In fact, it appeared to the Court that SCADIF wanted Mr. Clark to take the stand so that it could impeach him, which it did for several hours. SCADIF can not have its cake and eat it too.

Thus, while the Court believes that Mr. Clark should have delayed making these amendments to his treatise until after the conclusion of the litigation, and First Union should have timely disclosed Mr. Clark's prior involvement in the case, the Court will impose *no monetary sanctions* nor will it strike Mr. Clark's testimony.

SCADIF suffered no prejudice from these lapses in judgment, and it waived these arguments by its failure to timely object. Moreover, the Court believes that Mr. Clark and First Union acted in good faith and were not attempting to mislead this Court.

### 4. Misrepresenting of Facts and Abusive Deposition Conduct

 SCADIF complains about a number of alleged misrepresentations. SCADIF argues that (1) Ms. Turner's in court testimony contradicted her affidavit with regard to whether the check in question identified a separate branch; (2) Ms. Gray's in court testimony contradicted her deposition testimony with regard to whether she knew where the account was opened; (3) Barkley Clark misrepresented the extent of his knowledge at the time he advised against employing a separate branch defense; and (4) First Union misrepresented its knowledge as to what happened to the check once it was delivered.

First, SCADIF has failed to convince this Court that First Union's statements were actually false or inconsistent. First Union was able to sufficiently explain most, if not all of these alleged inconsistencies. Second, even if there was misleading misrepresentation, SCADIF presents no evidence that it was intentional. It seems highly unlikely that First Union would lie about these facts which are virtually irrelevant to the case. For instance, it seems unlikely that Ms. Turner would lie about what was identified on the check, when the Court can clearly look at the check and see what was or was not identified. Similarly, the question of what happened to the check once it was delivered was simply not an issue in this case. Thus, while the Court does not believe that First Union

intentionally made the misrepresentations of which SCADIF accuses it, even if First Union had made such representations, it would not have effected the outcome of the case, as the issues were all de minimus or irrelevant.

With regard to First Union's alleged abusive deposition conduct, while First Union's conduct may not have been the model of cordiality, it was not so abusive as to warrant sanctions, particularly in light of the many months which have passed since those depositions without complaint from SCADIF.

Although the Court declines to impose monetary sanctions or to strike testimony in this case, the Court does not fully approve of First Union's conduct in litigating this case. Even in an adversarial system, we better serve our clients and ourselves when we advance from minimal compliance to mutual cooperation. While corporate clients may view lawyers as just part of the cost of doing business, we cannot allow the loss of our civility to become just part of the cost of practicing law. A victory is a hollow one indeed, when it is won at the cost of an adversary's respect.

### CONCLUSION

Therefore, having been advised in the premises, it is hereby ORDERED AND ADJUDGED that JUDGMENT IS ENTERED IN FAVOR OF THE DEFENDANT FIRST UNION AND AGAINST THE PLAINTIFF SCADIF. The Plaintiff shall take nothing by his action and this case is CLOSED. Costs which are appropriate shall be taxed by a separate motion and order. Additionally, SCADIF's Motion for Sanctions is hereby DENIED, except to the extent that this Order shall serve as a written reprimand.