IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-04-00268-CV

 

Wells Fargo Bank, N.A.,

                                                                      Appellant/Cross-Appellee

 v.

 

Citizens Bank of Texas, N.A.,

                                                                      Appellee/Cross-Appellant

 

 

 



From the 9th District Court

Montgomery County, Texas

Trial Court No. 02-04-02426 CV

 



Opinion



 








          Citizens Bank of Texas, N.A. filed
suit against Pate & Pate Enterprises, Inc. and other related entities after
the defendants engaged in a check kiting scheme involving accounts with
Citizens Bank, Wells Fargo Bank Texas, N.A., and Wells Fargo Bank Ohio, N.A., resulting in overdrafts at Citizens Bank totaling $8,150,000.  Citizens Bank
amended its petition to name the Wells Fargo banks as defendants.  Citizens
Bank settled with the Pate defendants, and the court heard its remaining claims
in a bench trial.  The court rendered judgment in favor of Citizens Bank.

          Wells Fargo Texas, through its
successor in interest Wells Fargo Bank, N.A., contends in six issues that the
court erred by: (1) holding Wells Fargo Texas liable for failing to timely return
unpaid checks drawn on a Wells Fargo Ohio account; (2) finding that Wells Fargo
Texas breached a duty of good faith to Citizens; (3) imposing duties on Wells
Fargo Texas more stringent than the requirements of the U.C.C. or Regulation
CC; (4) finding that Wells Fargo Texas breached a duty of ordinary care; (5) 
awarding damages for breach of duty of ordinary care; and (6) finding that
$892,333 which had been garnished from Wells Fargo Texas was only a conditional
setoff against the judgment.

          Citizens Bank contends in its sole
cross-issue that it established as a matter of law that Wells Fargo Texas
promised to treat all checks drawn on any Wells Fargo bank as having been drawn
on Wells Fargo Texas and that the court’s finding to the contrary is against the
great weight and preponderance of the evidence.

          We will reverse and render.

Factual Background

          The Pate defendants are in the
pipeline construction business.  They have maintained accounts with Citizens
Bank since the early 1990’s.  Citizens Bank established a correspondent banking
relationship with Wells Fargo Texas’s predecessor in interest Norwest Bank Texas, N.A. in 1997.  Under this relationship, Norwest was responsible for processing
checks deposited with Citizens Bank and handling those checks for collection. 
Wells Fargo Texas assumed these responsibilities when it consolidated with
Norwest in 1999.

          In 1998, Norwest established a “controlled
disbursement account” for the Pate defendants.  Wells Fargo Texas continued
this account when it consolidated with Norwest.  Under this arrangement, the
Pate defendants wrote checks on a Wells Fargo Ohio bank account with a zero
balance.  Whenever a check was presented for payment from the Ohio account,
Wells Fargo Services Co. would electronically transfer funds in that amount
from the Pate defendants’ Wells Fargo Texas account to Wells Fargo Ohio to
cover the check.

          The parties dispute the purposes and
legitimacy of controlled disbursement accounts.  Nevertheless, it is undisputed
that the effect of the Pate defendants’ controlled disbursement account was to extend
the check collection process.  This resulted from the manner in which Wells
Fargo Texas processed checks written on the Ohio account.  For the Ohio checks, Wells Fargo Texas delivered the checks to the Federal Reserve Bank in Houston, which forwarded the checks to the Federal Reserve Bank in Ohio.  The Federal
Reserve Bank in Ohio then presented the checks to Wells Fargo Ohio for
payment.  Thus, Wells Fargo Texas held funds in the Pate defendants’ account
longer than it would have if the Pate defendants had written checks from a
Wells Fargo Texas account.[1]

          The dispute in this case focuses on
sixteen checks totaling $8,150,000 which the Pate defendants wrote on the Ohio account and deposited with Citizens Bank.  Under the terms of the correspondent
banking agreement, Citizens Bank delivered these checks to Wells Fargo Services
Co., which handled check processing services for Wells Fargo Texas.  Wells
Fargo Services processed these checks via the Federal Reserve Banks in Houston and Ohio as described.  Because of concerns that the Pate defendants were engaged in
a check kiting scheme,[2]
Wells Fargo Texas decided to place a hold on the funds in the Pate defendants’
accounts.

          Wells Fargo Ohio returned the checks
to Citizens Bank unpaid.  On receiving notice that these checks were
dishonored, Citizens Bank was able to return $2,728,375 of the checks to Wells
Fargo Texas.  However, because of the delay resulting from the checks being
processed through the controlled disbursement account in Ohio, Citizens Bank
was unable to return nearly $3,000,000 of the checks.[3] 
Citizens Bank suffered about $5,000,000 in losses from the Pate defendants’
overdrawn checks.

Procedural Background

          Citizens Bank alleges that Wells Fargo
Texas owed it a duty of good faith because of their correspondent banking
relationship.[4] 
Citizens Bank alleges that Wells Fargo Texas breached this duty by:

(1)              
implementing the controlled
disbursement account which “encouraged and facilitated the possibility of bank
fraud”; 

 

(2)              
“failing to disclose to
Citizens Bank the extra risk created by these accounts, and by intentionally
shifting to Citizens Bank the losses they created by placing holds on the
accounts, continuing to accept deposits and by returning checks unpaid to
Citizens Bank, especially when there were funds remaining in the account to
cover at least some of the checks returned”;

 

(3)              
using its superior knowledge
of information about the Pate defendants and Citizens Bank to its advantage;

 

(4)              
failing to expedite the
check collection process as required by contract and federal regulation; and

 

(5)              
giving Citizens Bank late
notice of non-payment.

 

          Citizens
Bank contends that Wells Fargo Texas is strictly liable under the U.C.C. for:

 

(1)              
failing to give timely
notice of non-payment; and

 

(2)              
providing defective notice
of non-payment by listing one dishonored check as being in the amount of
$50,000 rather than $500,000.

 

          Citizens Bank also alleges that Wells
Fargo Texas is liable for misrepresenting the status of the Pate Enterprises
account and for breach of the warranty of presentment by presenting cashier’s
checks to Citizens Bank for payment which had not been properly endorsed.

          The court found that Wells Fargo
Texas:[5]
(1) failed to timely return the checks; (2) breached the duty of good faith it
owed under the U.C.C. and Regulation CC; and (3) breached the duty of
disclosure it owed to Citizens Bank as its correspondent bank.  The court
rejected Citizens Bank’s breach of contract claim.  The court awarded Citizens
Bank $4,654,792 in damages, prejudgment interest, $870,676 in trial attorney’s
fees, appellate attorney’s fees, and court costs.  In the alternative (if the
judgment is reversed on the theory that Wells Fargo Texas and Wells Fargo Ohio must
be treated as separate legal entities), the court found that Wells Fargo Ohio
acted as an agent for Wells Fargo Texas and awarded Citizens Bank $2,947,973,
which represents the additional amount of checks Citizens Bank could have
returned if it had received earlier notice that the checks had been dishonored.

Controlled Disbursement Accounts

          The trial court found that “Wells
Fargo Texas set up the Ohio account for the purpose of evading or extending the
time limits set forth in the UCC and Reg[ulation] CC.”  Thus, the court
implicitly found that the Ohio account was a delayed disbursement account,
which is disfavored by the Federal Reserve, rather than a controlled
disbursement account as Wells Fargo Texas contends.

          Under the typical scenario, a
controlled disbursement account is a checking account with a zero balance held
by a corporation.  When a check written on this account is presented for
payment, funds from an interest-bearing account are transferred to the zero
balance account to pay the check.[6]  See
e.g. Schering-Plough Healthcare Prods., Inc. v. NBD Bank, N.A., 98 F.3d
904, 910 (6th Cir. 1996); RPM Pizza, Inc. v. Bank One Cambridge, 869 F.
Supp. 517, 518-19 (E.D. Mich. 1994).

                    Banks offering controlled
disbursement services notify their corporate customers early in the day of the
amount of the corporation’s check payments that have been presented that day so
that the corporation can invest surplus balances or borrow additional funds, as
necessary, while money markets are still active. U.S. money markets become
progressively less liquid after noon Eastern Time.

 

Collection of Checks and Other Items by Federal
Reserve Banks and Availability of Funds and Collection of Checks, 63 Fed. Reg. 12700, 12702 n.6 (Mar. 16, 1998).

          Controlled disbursement accounts are strikingly
similar to delayed (or remote) disbursement accounts, the use of which was
sharply criticized as “an abuse of the check collection system” by the
Comptroller of the Currency in 1979.  Comptroller of the Currency, Banking
Circular No. 121, 1979 OCC CB LEXIS 11 at *1 (Feb. 7, 1979).  The Federal
Reserve continues to view such accounts with disfavor.

          General policy. Delayed disbursement
(sometimes referred to as “remote” disbursement) is the practice of issuing
checks that are payable by, through, or at a bank located in a geographic area
such that collection of the checks is generally delayed.  For example, these
arrangements may be designed to delay the collection and payment of checks by
drawing checks on banks located substantial distances from the payee or outside
of Federal Reserve cities when alternate and more efficient payment
arrangements are available.

 

                   The Board is concerned that
delayed disbursement practices reduce the efficiency of the check collection
system.  Drawing a check on a bank remote from the payee often increases the
costs of handling the check.  More institutions are likely to handle the check
before it is finally paid, increasing processing costs, and higher
transportation costs are incurred to move checks greater distances.  In
addition, delays in collection time can impose float costs on depositary
banks.  Furthermore, delayed disbursement practices delay the return of unpaid
checks, increasing the possibilities for check fraud and other losses.

 

                   The Board believes the
banking industry has a public responsibility not to design, offer, promote, or
otherwise encourage the use of a service that is intended to delay payment and
that exposes payment recipients and depositary banks to greater-than-ordinary
risks.  The Board urges the nation’s banks and check-related service providers
to eliminate delayed disbursement practices intended to obtain extended float.

 

                   There is no intention to
discourage corporate disbursement arrangements with banks that provide for
improved control over daily cash requirements, provided that these arrangements
do not result in the undesirable effects noted above. Banks should provide the
cash management services needed by their customers through the use of payments
methods that facilitate prompt funds availability to payment recipients and
that protect banks from unnecessary risk.

 

Policy Statement on Delayed Disbursement, 64 Fed. Reg. 51762, 51762 (Sept. 24, 1999)
(footnote omitted).

          The differentiation between the
disfavored delayed disbursement accounts and legitimate controlled disbursement
accounts appears to lie in the intended purpose of the account when created. 
The former have been referred to as accounts which are “intended to obtain
extended float” or “designed expressly to delay payment.”  See id.;
Banking Circular No. 121, 1979 OCC CB LEXIS 11 at *1.  Conversely, the Federal
Reserve has recognized that the aim of legitimate controlled disbursement
accounts is “not the ability to generate float, but the ability to make
investment and borrowing decisions early in the day based on knowledge of the
value of that day’s check presentments.”  Collection of Checks and Other
Items by Federal Reserve Banks and Availability of Funds and Collection of
Checks, 63 Fed. Reg. 68701, 68702 (Dec. 14, 1998).

          Regardless of the characterization
however, delayed disbursement accounts are not, strictly speaking, unlawful. 

Payor Bank

          Wells Fargo Texas contends in its
first issue that the court erred by holding it liable for failing to timely
return the unpaid checks because: (1) Wells Fargo Texas was not the payor bank
for those checks as a matter of law; (2) Wells Fargo Texas and Wells Fargo Ohio
were separate banks; and (3) Wells Fargo Texas and Wells Fargo Ohio were not a
single business enterprise.

          Wells Fargo Texas contends that we
should not look beyond the four corners of the checks to determine the identity
of the payor bank.  Citizens Bank responds that we should look beyond the face
of the checks and consider the close relationship between Wells Fargo Texas and
Wells Fargo Ohio.

          A “payor bank” is “a bank that is the
drawee of a draft.”  Tex. Bus. &
Com. Code Ann. § 4.105(3) (Vernon 2002).  The “drawee” is the “person
ordered in a draft to make payment.”  Id. § 3.103(a)(2) (Vernon Supp. 2004–2005).  In this case, the “drafts” are the sixteen checks at issue.  Id. 3.104(f) (Vernon 2002).

          Regulation CC[7]
uses the term “paying bank” rather than “payor bank.”  12 C.F.R. § 229.2(z)
(2005).  Regulation CC defines a “paying bank” in pertinent part as “the bank at which a check is payable and to which it is sent for
payment or collection.”  Id. § 229.2(z)(2)  The term “includes . . . the
bank whose routing number appears on a check in fractional or magnetic form and
to which the check is sent for payment or collection.”  Id. § 229.2(z).

          Several courts have discussed the
“four corners rule” advocated by Wells Fargo Texas.  See Gathercrest, Ltd.
v. First Am. Bank & Trust, 649 F. Supp. 106, 116-17 (M.D. Fla. 1985), aff’d,
805 F.2d 995 (11th Cir. 1986); SCADIF, S.A. v. First Union
Natl. Bank, 208 F. Supp. 2d 1352, 1368-69 (S.D. Fla. 2002), aff’d,
344 F.3d 1123 (11th Cir. 2003); Engine Parts, Inc. v. Citizens Bank of
Clovis, 92 N.M. 37, 582 P.2d 809, 812-13 (1978); Bank of Am., N.T. &
S.A. v. David W. Hubert, P.C., 153 Wash. 2d 102, 101 P.3d 409, 414-15
(2004); see also Horney v. Covington County Bank, 716 F.2d 335, 338-39
(5th Cir. 1983).

          The rule which has emerged from these
decisions is that courts should not stray from the four corners of a check to
determine the respective roles of the parties to a check, unless the check is
ambiguous on its face.  See Gathercrest, 649 F. Supp. at 116-17; Engine
Parts, 582 P.2d at 812-13.  The actions of parties to a check transaction
cannot alter the respective roles of the parties to an otherwise unambiguous
document.  See W. Air & Refrigeration, Inc. v. Metro Bank of Dallas, 599 F.2d 83, 90 (5th Cir. 1979); Gathercrest, 649 F. Supp. at 116-17; Farmers
Coop. Livestock Mkt., Inc. v. Second Natl. Bank of London, 427 S.W.2d 247,
249-50 (Ky. App. 1968); Engine Parts, 582 P.2d at 812-13; Bank of Am.,
101 P.3d at 414.

          The checks at issue are unambiguous. 
Each orders Wells Fargo Ohio to pay the sum indicated, and each provides the
physical address (city and state) of Wells Fargo Ohio, its MICR routing number,[8]
and the Pate defendants’ account number for the account maintained at Wells
Fargo Ohio.  Therefore, Wells Fargo Ohio is the “payor bank” for these checks
under section[9]
4.105(3).  Id.  For the same reasons, Wells Fargo Ohio is the “paying
bank” under Regulation CC.  See 12 C.F.R. § 229.2(z).

          Nevertheless, Citizens Bank cites
section 4.107 for the proposition that, because Wells Fargo Ohio did not
“function as a separate bank” from Wells Fargo Texas, Wells Fargo Ohio should
not be accorded the time limits available to a separate bank for processing
checks.  Section 4.107 provides, “A branch or separate office of a bank is a
separate bank for the purpose of computing the time within which and
determining the place at or to which action may be taken or notices or orders
must be given under this chapter and under Chapter 3.”  Tex. Bus. & Com. Code Ann. § 4.107 (Vernon 2002).[10]

          Comment 4 to section 4.107 provides in
part, “[I]f in its relations to customers a branch functions as a separate
bank, notices and orders with respect to accounts of customers of the branch
should be given at the branch.”  Id. cmt. 4 (Vernon 2002).  Citizens
Bank contends that Wells Fargo Ohio does not function as a separate bank with
respect to the Pate defendants’ account because the decision-making with
respect to funding the Ohio account lies with Wells Fargo Texas.

          However, the exercise of this
decision-making function by the bank holding the funding account is precisely
the manner in which controlled disbursement accounts operate.  See e.g.
Schering-Plough Healthcare Prods., 98 F.3d at 910 (describing workings of
zero balance controlled disbursement account).  The focus of section 4.107 is
on the operations of the bank alleged to not be a separate bank rather than on
the “parent” bank.

          The evidence in the record is that
Wells Fargo Ohio was a separately chartered bank.  It was a “real bank” with
its own officers and tellers.  Thus, Wells Fargo Ohio performed the functions
of a separate bank and must be treated as a separate bank for purposes of
determining the applicable deadlines for processing checks.  See Tex. Bus. & Com. Code Ann. § 4.107;
see also Pulaski Bank & Trust Co. v. Tex. Am. Bank/Fort Worth, N.A.,
759 S.W.2d 723, 733 (Tex. App.—Dallas 1988, writ denied) (“[e]ven
closely-related banks” are each entitled to 24 hours to process a check).

          Wells Fargo Texas next challenges
Citizens Bank’s assertion that Wells Fargo Ohio and it should be considered to
have operated as a single business enterprise.  According to the single
business enterprise theory, “when two corporations are not operated as separate
entities but instead integrate their resources to achieve a common business
purpose, it may be equitable, under exceptional circumstances, to hold each
constituent corporation liable for the debts and liabilities incurred in the
common enterprise.”  N. Am. Van Lines, Inc. v. Emmons, 50 S.W.3d 103,
120 (Tex. App.—Beaumont 2001, pet. denied).

          Again, Wells Fargo Ohio was a
separately chartered bank with its own officers and tellers.  Thus, Wells Fargo
Texas and Wells Fargo Ohio “operated as separate entities.”  Therefore, the
“exceptional circumstances” required to find a single business enterprise do
not exist in this case.  Accordingly, Wells Fargo Texas is not liable under
Citizens Bank’s single business enterprise theory.  See Pulaski Bank &
Trust Co., 759 S.W.2d at 733.

          Citizens Bank also suggests that the
checks should be treated as “payable through” items under section 4.106.  Section
4.106 provides in pertinent part:

          (a) If an item states that it is
“payable through” a bank identified in the item, the item:

 

          (1) designates the bank
as a collecting bank and does not by itself authorize the bank to pay the
item;  and

 

          (2) may be presented for
payment only by or through the bank.

 

Tex. Bus. & Com.
Code Ann. § 4.106(a) (Vernon 2002).   

          As comment 1 to this section explains,


          Some items are made “payable through”
a particular bank.  Subsection (a) states that such language makes the bank a
collecting bank and not a payor bank.  An item identifying a “payable through”
bank can be presented for payment to the drawee only by the “payable through”
bank.  The item cannot be presented to the drawee over the counter for
immediate payment or by a collecting bank other than the “payable through”
bank.

 

Id. cmt. 1 (Vernon 2002).

          The checks at issue do not state that they are “payable through”
Wells Fargo Ohio.  Under section 4.106, “payable through” checks must be
presented to the drawee bank by the payable through bank.  Therefore, if Wells
Fargo Ohio was a “payable through” bank for the checks, then the checks would
have to be first routed through Wells Fargo Ohio for presentment and could not
be presented to Wells Fargo Texas for payment by Citizens Bank.  See id. 
Thus, the checks were not treated by the parties as “payable through” items and
are not “payable through” items as a matter of law.

          Accordingly, we sustain Wells Fargo
Texas’s first issue.

Correspondent Bank

          Wells Fargo Texas contends in its
second issue that the court erred by holding that it breached a duty of
expeditious return and a duty of good faith owed to Citizens Bank because (1)
Wells Fargo Texas is not the payor bank and (2) Wells Fargo Texas had no
contractual duty to expedite the collection of the checks.  Wells Fargo Texas
contends in its third issue that the court erred by imposing duties on Wells
Fargo Texas more stringent than the requirements of the U.C.C. or Regulation
CC.  Wells Fargo Texas contends in its fourth issue that there is no evidence
or factually insufficient evidence to support the court’s finding that it
breached the duty of ordinary care it owed as a collecting bank.

          Citizens Bank contends in its sole
cross-issue that the evidence establishes as a matter of law that Wells Fargo
Texas agreed to treat all Wells Fargo checks as being drawn on Wells Fargo
Texas and that the court’s finding to the contrary is against the great weight
and preponderance of the evidence.

          We have already determined that Wells
Fargo Texas is not the payor bank (or paying bank) for these checks.  To
resolve these issues, we must determine: (1) the roles Wells Fargo Texas and
Citizens Bank played in these transactions; (2) the nature of their
correspondent banking relationship; (3) and the duties Wells Fargo Texas and
Wells Fargo Ohio owed in these transactions.

          When the Pate defendants deposited
each of the sixteen Wells Fargo Ohio checks in their Citizens Bank account,
Citizens Bank became the “depositary bank” as to each check.[11] 
See Tex. Bus. & Com. Code
Ann. § 4.105(2) (Vernon 2002); Pulaski Bank & Trust Co., 759
S.W.2d at 725.  When Citizens Bank delivered the checks to Wells Fargo Texas
for collection, Wells Fargo Texas became an “intermediary bank.”[12] 
See Tex. Bus. & Com. Code
Ann. § 4.105(4) (Vernon 2002); Pulaski Bank & Trust Co., 759
S.W.2d at 726.  Citizens Bank and Wells Fargo Texas were both “collecting
banks.”[13]  See
Tex. Bus. & Com. Code Ann. §
4.105(5) (Vernon 2002); Pulaski Bank & Trust Co., 759 S.W.2d at 726. 
As we have already observed, Wells Fargo Ohio was the payor bank (but not a
“collecting bank”).  See Tex.
Bus. & Com. Code Ann. § 4.105(3), (5); Pulaski Bank & Trust
Co., 759 S.W.2d at 726.

          Citizens Bank contends that its
correspondent banking relationship with Wells Fargo Texas placed a higher duty
on Wells Fargo than would otherwise be required as between banks engaged in an
arms-length transaction.  However, the weight of authority seems to be that
“[a] correspondent bank relationship, standing alone, does not create an agency
relationship.”  Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A.,
731 F.2d 112, 122 (2d Cir. 1984); accord Bank Urquijo, S.A. v. Signet Bank/Md., 861 F. Supp. 1220, 1249 (M.D. Pa. 1994); Peavy-Moore Lumber Co. v. First Natl.
Bank of Beaumont, 133 Tex. 467, 128 S.W.2d 1158, 1162 (1939); Tillman
County Bank v. Behringer, 113 Tex. 415, 257 S.W. 206, 206-08 (1923); see
also Tex. Bus. & Com. Code Ann.
§ 4.201(a) (Vernon 2002).  Nor does a correspondent bank relationship standing alone
create a fiduciary relationship.  Aaron Ferer & Sons, 731 F.2d at
122; Bank Urquijo, 861 F. Supp. at 1249; accord Peavy-Moore Lumber
Co., 128 S.W.2d at 1162; Tillman County Bank, 257 S.W. at 206-08;
see also Tex. Bus. & Com. Code
Ann. § 4.201(a).  Instead, the correspondent bank is the agent of the
owner of any item forwarded to it for collection.  See Tex. Bus. & Com. Code Ann. §
4.201(a).

          From a review of the agreements
between Citizens Bank and Wells Fargo Texas’s predecessor in interest Norwest Bank,
this correspondent banking relationship essentially made Citizens Bank a
depositor with Wells Fargo Texas.  The relationship between a bank and its
customer does not usually create a fiduciary relationship.  Wil-Roye Inv.
Co. II v. Wash. Mut. Bank, F.A., 142 S.W.3d 393, 410 (Tex. App.—El Paso 2004,
no pet.); Fleming v. Tex. Coastal Bank of Pasadena, 67 S.W.3d 459, 461 (Tex. App.—Houston [14th Dist.] 2002, pet. denied).

          There is caselaw to the effect that a
depositary bank such as Citizens Bank in this case becomes the owner of a check
if the bank gives the depositor unrestricted credit for the full amount of the
check.  See e.g. Schnitger v. Backus, 10 Wash. App. 754, 519 P.2d 1315,
1319 (1974); Pazol v. Citizens Natl. Bank of Sandy Springs, 110 Ga. App.
319, 138 S.E.2d 442, 445 (1964); S. End Bank & Trust Co. v. Nasin,
147 Conn. 215, 158 A.2d 591, 593 (1960); Commercial Natl. Bank of
Hutchinson, Kan. v. Heid Bros., Inc., 226 S.W. 806, 809 (Tex. Civ. App.—El
Paso 1920), rev’d on other grounds, 240 S.W. 908 (Tex. Comm’n App. 1922,
holding approved).  In this situation, an intermediary bank in the check
collection process becomes the agent of the depositary bank (as owner of the
check) rather than the agent of the depositor.

          Here, Citizens Bank gave the Pate
defendants immediate access to $1,475,000 of the $8,150,000 in dispute by
issuing cashier’s checks in that amount.  Thus, it could be argued that Wells
Fargo Texas became the agent of Citizens Bank with respect to the $1,475,000
which the latter made available to the Pate defendants through cashier’s
checks.  However, the U.C.C. changed these common law principles regarding the
ownership of items such as checks.

          Section 4.201(a) provides:

          (a)      Unless a contrary intent
clearly appears and before the time that a settlement given by a collecting
bank for an item is or becomes final, the bank, with respect to the item, is an
agent or sub-agent of the owner of the item and any settlement given for the
item is provisional.  This provision applies regardless of the form of
indorsement or lack of indorsement and even though credit given for the item is
subject to immediate withdrawal as of right or is in fact withdrawn; but the
continuance of ownership of an item by its owner and any rights of the owner to
proceeds of the item are subject to rights of a collecting bank, such as those
resulting from outstanding advances on the item and rights of recoupment or
setoff.  If an item is handled by banks for purposes of presentment, payment,
collection, or return, the relevant provisions of this chapter apply even
though action of the parties clearly establishes that a particular bank has
purchased the item and is the owner of it.

 

Tex.
Bus. & Com. Code Ann. §
4.201(a).

          The Texas Supreme Court has construed
section 4.201(a) to mean that, regardless of whether a bank permits the
immediate withdrawal of funds for a check which has not yet been collected,
ownership of the check remains with the depositor, and the bank is merely the
agent for the depositor.  Romo v. Austin Natl. Bank, 615 S.W.2d 168, 170
(Tex. 1981); see also Alta Vista State Bank v. Kobliska, 897 F.2d 930,
933 (8th Cir. 1990).

          Therefore, in the collection process,
Wells Fargo Texas acted as an agent for the Pate defendants and not for
Citizens Bank.  Nevertheless, Wells Fargo Texas had certain duties under the
U.C.C. with respect to the collection of the checks.

Forward Collection

          As a collecting bank, Wells Fargo
Texas owed the duties provided by section 4.202.[14]

          (a) A collecting bank must exercise
ordinary care in:

 

          (1) presenting an item or
sending it for presentment;

 

          (2) sending notice of
dishonor or non-payment or returning an item other than a documentary draft to
the bank’s transferor after learning that the item has not been paid or
accepted, as the case may be;

 

          (3) settling for an item
when the bank receives final settlement; and

 

          (4) notifying its
transferor of any loss or delay in transit within a reasonable time after
discovery thereof.

 

          (b) A collecting bank exercises
ordinary care under Subsection (a) by taking proper action before its midnight
deadline following receipt of an item, notice, or settlement.  Taking proper
action within a reasonably longer time may constitute the exercise of ordinary
care, but the bank has the burden of establishing timeliness.

 

          (c) Subject to Subsection (a)(1), a
bank is not liable for the insolvency, neglect, misconduct, mistake, or default
of another bank or person or for loss or destruction of an item in the
possession of others or in transit.

 

Tex.
Bus. & Com. Code Ann. § 4.202
(Vernon 2002).

          The “‘[m]idnight deadline’” with
respect to a bank is midnight on its next banking day following the banking day
on which it receives the relevant item or notice or from which the time for
taking action commences to run, whichever is later.”  Id. § 4.104(a)(10)
(Vernon Supp. 2004–2005).

          The checks at issue were grouped in
four batches.  The first, checks 6922 through 6925, was deposited with Wells
Fargo Texas on Monday, March 25 and forwarded by Wells Fargo Texas to the
Federal Reserve Bank the next day.  The second batch, checks 6926 and 6928
through 6930, was deposited on Tuesday, March 26 but not forwarded until
Thursday, March 28 because of a computer malfunction.  The third batch, checks
6933 through 6936, was deposited on Wednesday, March 27 and forwarded the next
day.  The last batch, checks 6938 through 6941, was deposited on Thursday,
March 28 but not forwarded until Saturday, March 30.

          Thus, it is undisputed that Wells
Fargo Texas forwarded the first and third batches of checks to the Federal
Reserve Bank before its midnight deadline.  Therefore, Wells Fargo Texas
“exercise[d] ordinary care” with respect to these checks.  See Tex. Bus. & Com. Code Ann. §
4.202(b).

          With respect to the third batch, Wells
Fargo Texas contends that the one-day delay in forwarding is excused because of
the computer malfunction.  Section 4.109(b) provides:

                   Delay by a collecting bank or
payor bank beyond time limits prescribed or permitted by this title or by
instructions is excused if:

 

          (1) the delay is caused
by interruption of communication or computer facilities, suspension of payments
by another bank, war, emergency conditions, failure of equipment, or other
circumstances beyond the control of the bank; and

 

                    (2) the bank exercises such
diligence as the circumstances require.

 

Id.
§ 4.109(b) (Vernon 2002).

 

          Wells Fargo Texas presented
uncontroverted evidence that its computer system was malfunctioning on the date
the second batch of checks was deposited and that it exercised diligence in
locating technicians to restore the system.  Thus, Wells Fargo Texas “is
excused” for the one-day delay in forwarding this batch of checks.  Id.

          With respect to the fourth batch of
checks, which Wells Fargo Texas forwarded to the Federal Reserve Bank on the
Saturday following its Friday midnight deadline, Wells Fargo Texas contends
that its delay in forwarding this batch of checks is excused because the checks
were still presented to Wells Fargo Ohio on the next banking day (Monday), just
as they would have been if they had been forwarded to the Federal Reserve Bank
on Friday.

          To support this contention, Wells
Fargo Texas cites 12 C.F.R. § 229.30(c), which provides an automatic extension
of the paying bank’s deadline for return or notice of non-payment “to the time
of dispatch” if the return or notice is received by the next bank on the next
banking day.  Wells Fargo Texas suggests that “[i]f such no-harm/no-foul rule
applies to the more rigorous return side of the check collection and processing
system, surely as a matter of law, it should apply to the less rigorous check
forwarding side of the process.”

          Although this argument in the abstract
is attractive, it finds no support in the plain language of section 4.202. 
Thus, we cannot fault the trial court for concluding that Wells Fargo Texas
failed to exercise ordinary care in forwarding the fourth batch of checks to
the Federal Reserve Bank.

          The former section 1.203 provided,
“Every contract or duty within this title imposes an obligation of good faith
in its performance and enforcement.”  Business and Commerce Code, 60th Leg.,
R.S., ch. 785, § 1, sec. 1.203, 1967 Tex. Gen. Laws 2343, 2352 (amended 2003) (current
version at Tex. Bus. & Com. Code
Ann. § 1.304 (Vernon Supp. 2004–2005)).[15]  
Citizens Bank contends that Wells Fargo Texas failed to act in good faith
because it did not forward the checks by means of the most expeditious route
available.

          However, section 1.203 does not
provide an independent cause of action.  See N. Natl. Gas Co. v. Conoco,
Inc., 986 S.W.2d 603, 606-07 & n.2 (Tex. 1998); Fetter v. Wells
Fargo Bank Tex., N.A., 110 S.W.3d 683, 689 (Tex. App.—Houston [14th Dist.]
2003, no pet.); John Wood Group USA, Inc. v. ICO, Inc., 26 S.W.3d 12, 22
(Tex. App.—Houston [1st Dist.] 2000, pet. denied).   Nor can a bank be said to
violate its “obligation of good faith” under section 1.203 if it acts in
accordance with the requirements of the U.C.C.  See Fetter, 110 S.W.3d
at 691; Hill v. St. Paul Fed. Bank for Sav., 329 Ill. App. 3d 705, 768
N.E.2d 322, 326 (2002).

          As stated, Wells Fargo Texas delivered
the first three batches of checks to the Federal Reserve Bank within the time
limits required by the U.C.C..  Thus, Wells Fargo Texas cannot be said to have
violated its “obligation of good faith” with respect to these checks under
section 1.203.  Id.

          Several cases suggest that a bank owes
a heightened duty of care toward another bank only if: (1) the banks share a
fiduciary or confidential relationship; (2) the banks have a contractual relationship;
(3) a legal duty requires it; or (4) the defendant bank committed fraud or made
a misrepresentation.  See Frost Natl. Bank v. Midwest Autohaus, Inc.,
241 F.3d 862, 874 n.7 (7th Cir. 2001); Cumis Ins. Society, Inc. v. Windsor
Bank & Trust Co., 736 F. Supp. 1226, 1233 (D. Conn. 1990); First
Natl. Bank in Harvey v. Colonial Bank, 898 F. Supp. 1220, 1231 (N.D. Ill.
1995).

          Here, we have already concluded that
the banks’ correspondent banking relationship standing alone did not create a
fiduciary or confidential relationship.  See Aaron Ferer & Sons, 731
F.2d at 122; Bank Urquijo, 861 F. Supp. at 1249; Peavy-Moore Lumber
Co., 128 S.W.2d at 1162; Tillman County Bank, 257 S.W. at 206-08. 
We have already concluded that Wells Fargo Texas complied with its legal duties
under the U.C.C. (at least with respect to the first three batches of checks). 
Citizens Bank does not contend that Wells Fargo Texas acted fraudulently or
made a misrepresentation.[16]  We
now examine the banks’ contractual relationship to determine whether it may
impose a heightened duty of care on Wells Fargo Texas.

          The Master Agreement for Cash
Management Services Citizens Bank executed with Wells Fargo Texas’s predecessor
in interest Norwest Bank provides in pertinent part:

          Scope of the Services. 
The Bank shall provide the Company with the cash management services requested
in writing and the Services agreed to by the Bank.  The services are described
in general terms in separate writings which are specifically incorporated into
this Agreement (the “Product Descriptions”).  The Company agrees to the terms
and conditions contained in the applicable Product Description(s); the Bank’s user
guide (the “Guide”), if any, for each Service it requests; and the Bank’s terms
and conditions applicable to each account affected by the Services (the
“Account Terms”).

 

Citizens Bank’s account agreement provides in
pertinent part, “Any non-cash items tendered for deposit (including items drawn
‘on-us’) will be given provisional credit only until collection is final . . .
.”

          Citizens Bank contends that Wells
Fargo Texas effectively modified the terms of the account agreement by issuing
an “Accelerated Availability Schedule” which states in pertinent part:

          Wells Fargo checks drawn in all states
are now treated as “On-Us.”  See page 4 for details and deadlines.  Financial
Institution depositors receive 100% immediate availability for On-Us items
deposited prior to Noon.

 

According to the funds availability schedule
applicable to checks written on the Wells Fargo Ohio account, funds for a check
deposited with Wells Fargo Texas before 2:00 p.m. on a banking day would be
“collected and available for use” on the next banking day.

          Citizens Bank’s Executive
Vice-President Debra Mitcham testified that Citizens Bank overrode the usual
five-day holds on the Wells Fargo Ohio checks deposited by the Pate defendants
because “we knew that they were Wells checks and we knew that they were
clearing—or we thought they were clearing sooner.”  When asked to explain why
Citizens Bank thought this, Mitcham responded, “Because, Wells is Wells, it’s
an ‘on-us’ item, and through conversations I had with Mike Moses [an officer at
Wells Fargo Texas].”

          Mitcham later recounted her
conversation with Moses.

Q:               
Did you talk to Mr. Moses
about how soon the checks written on the Ohio account would clear?

 

A:      No.

 

Q:               
Go through the clearing
process?

 

A:      No, because he told me that
they were Wells checks.  I just assumed that everything was the same computer
system and they would be clearing overnight . . . .

 

          For his part, Moses testified that he
negotiated only with a certain Roger Lawrence when the correspondent banking
relationship was established with Citizens Bank.  He did not recall ever having
a conversation with Mitcham but conceded that it could have happened.  However,
Moses vehemently denied ever discussing with Mitcham the possibility of treating
Wells Fargo Ohio checks as “on-us” items for purposes of settlement because “we
would lose our shirt on something like that” and “no bank in the country would
do that.”

          Mitcham testified that she “assumed”
the Pate defendants’ checks would be cleared sooner based on her conversation
with Moses.  Moses vehemently denied making any representations to this
effect.  Thus, Citizens Bank did not establish as a matter of law that Wells
Fargo Texas agreed to treat the Pate defendants’ Wells Fargo Ohio checks as
being drawn on Wells Fargo Texas.  Nor is the court’s finding to the contrary
against the great weight and preponderance of the evidence.

          Instead, the Cash Management Services
agreement and Citizens Bank’s account agreement with Wells Fargo Texas reflect
an arms-length correspondent banking relationship.  Therefore, because the
banks did not share a fiduciary or confidential relationship, because the
banks’ contractual relationship established only an arms-length relationship,
because Wells Fargo Texas fulfilled its legal duties under the U.C.C. (with
respect to the first three batches of checks), and because Wells Fargo did not
commit fraud or misrepresentation with respect to Citizens Bank, we hold that
Wells Fargo did not owe a heightened duty of care toward Citizens Bank with
respect to the first three batches of checks.  See Frost Natl. Bank, 241
F.3d at 874 n.7; Cumis Ins. Society, 736 F. Supp. at 1233; First
Natl. Bank in Harvey, 898 F. Supp. at 1231.

          For the forward collection process,
Wells Fargo Texas exercised ordinary care and did not breach any duties it owed
with respect to the first three batches of checks.  However, Wells Fargo Texas
did fail to exercise ordinary care in forwarding the fourth batch of checks.

Return of the Checks

          Upon presentment, Wells Fargo Ohio was
accountable for the full amount of the checks if it did “not pay or return
[them] or send notice of dishonor until after its midnight deadline.”  Tex. Bus. & Com. Code Ann. § 4.302(a)(1)
(Vernon 2002); Pulaski Bank & Trust Co., 759 S.W.2d at 726.  Items
are considered “returned” when “sent to the bank’s customer or transferor or
pursuant to instructions.”   Tex. Bus.
& Com. Code Ann. § 4.301(d)(2) (Vernon 2002).

          Regulation CC provides for an
extension of this return deadline in certain circumstances.

          (c)  Extension of deadline.  The deadline for return or
notice of nonpayment under the U.C.C. or Regulation J (12 CFR part 210), or §
229.36(f)(2) is extended to the time of dispatch of such return or notice of
nonpayment where a paying bank uses a means of delivery that would ordinarily
result in receipt by the bank to which it is sent—

 

          (1) On or before the receiving bank’s
next banking day following the otherwise applicable deadline by the earlier of
the close of that banking day or a cutoff hour of 2 p.m. or later set by the
receiving bank under U.C.C. 4-108, for all deadlines other than those described
in paragraph (c)(2) of this section; this deadline is extended further if a
paying bank uses a highly expeditious means of transportation, even if this
means of transportation would ordinarily result in delivery after the receiving
bank’s next cutoff hour or banking day referred to above; or

 

          (2) Prior to the cut-off
hour for the next processing cycle (if sent to a returning bank), or on the
next banking day (if sent to the depositary bank), for a deadline falling on a
Saturday that is a banking day (as defined in the applicable U.C.C.) for the
paying bank.

 

12
C.F.R. § 229.30(c) (2005).

 

          The court made two findings of fact pertinent
to the alleged delay in the return of the checks by Wells Fargo Ohio.

          42.     After the Federal Reserve Bank
delivered the checks to the processing center for Wells Fargo Ohio in Minneapolis, Wells Fargo Services Co. was responsible for delivering the checks to the
Federal Reserve Bank of Minneapolis for return to Citizens Bank within the
midnight deadline. . . .  Wells Fargo Service Co. had copies of delivery
receipts .  .  .  but could not match the receipts to particular items.  .  .  . 
All that is known is that the items were delivered to the Federal Reserve Bank
by 6:00 p.m. of the day following the midnight deadline (assuming Wells Fargo
Ohio as the place of presentment).  .  .  .  The Federal Reserve Bank had
records showing the times of delivery, but these were destroyed.  Consequently,
neither party had direct evidence regarding whether Wells Fargo Ohio timely
returned the items in dispute to Citizens Bank.

 

43.     Wells Fargo Texas and Wells Fargo Ohio
contend they are entitled to a one-day extension of the midnight deadline under
Reg. CC, 12 C.F.R. § 229.30.  .  .  .  The Court finds that the use of Reg. CC
to extend the midnight deadline by the correspondent bank in the context of a
check kite constitutes bad faith.  .  .  .  Wells Fargo Texas breached its duty
of good faith by using Reg. CC as a means of extending the midnight deadline
and [ ] this breach caused damages to Citizens Bank. [17]

 

          Warren Magnuson, who works in the
return department for Wells Fargo Services Co. in Minnesota,[18]
testified that the checks were prepared for pickup by a courier at or near the
midnight deadline for their return.  He conceded that he did not know whether
they were received by the Federal Reserve Bank before the midnight deadline. 
All he could say with certainty was that they were received before 6:00 p.m.
the following day.

          The first batch of checks was
presented to Wells Fargo Ohio on March 27.  Wells Fargo Ohio returned this
batch to the Federal Reserve Bank on March 29, one day after its midnight
deadline.  The second and third batches were presented to Wells Fargo Ohio on
Friday March 29.  Wells Fargo Ohio returned these batches on Tuesday April 2,
one day late.  The fourth batch was presented on April 1 and returned on April
3, one day late.

          Wells Fargo Ohio’s return of the
checks to the Federal Reserve Bank appears to fit within the extension provided
by Regulation CC.  The only reasons the trial court recited for declining to
permit this extension were that Wells Fargo Texas (1) knew or suspected that
the Pate defendants were engaged in a check kite and (2) should be held to a
higher duty because of its correspondent banking relationship with Citizens
Bank.

          We have already rejected the latter of
these rationales.  The banks’ correspondent banking relationship standing alone
did not create a fiduciary or confidential relationship which would impose
higher than ordinary duties of care on Wells Fargo Texas.  See Aaron Ferer
& Sons, 731 F.2d at 122; Bank Urquijo, 861 F. Supp. at 1249; Peavy-Moore
Lumber Co., 128 S.W.2d at 1162; Tillman County Bank, 257 S.W. at 206-08. 
Accordingly, Wells Fargo Texas had no obligation toward Citizens Bank with
respect to the former’s knowledge or suspicion that the Pate defendants were
engaged in a check kite.  See Frost Natl. Bank, 241 F.3d at 874; Alta
Vista State Bank, 897 F.2d at 934; Cumis Ins. Society, 736 F. Supp.
at 1233; First Natl. Bank in Harvey, 898 F. Supp. at 1231; Citizens
Natl. Bank v. First Natl. Bank, 347 So. 2d 964, 967 (Miss. 1977).

          We have also concluded that Wells
Fargo Texas and Wells Fargo Ohio were separate banks entitled to separate
deadlines for processing checks under the U.C.C.  See Tex. Bus. & Com. Code Ann. § 4.107;
see Pulaski Bank & Trust Co., 759 S.W.2d at 733.  Thus, any knowledge
or suspicions attributable to Wells Fargo Texas would not impact Wells Fargo
Ohio’s deadlines for returning the checks.  Accordingly, Wells Fargo Ohio
timely returned the checks.

          Nevertheless, Regulation CC also
requires that a paying bank notify the depositary bank if it “determines not to
pay a check in the amount of $2,500 or more.”  12 C.F.R. § 229.33(a) (2005). 
The notice requirement is as follows:

                   If a paying bank determines
not to pay a check in the amount of $2,500 or more, it shall provide notice of
nonpayment such that the notice is received by the depositary bank by 4:00 p.m.
(local time) on the second business day following the banking day on which the
check was presented to the paying bank.  If the day the paying bank is required
to provide notice is not a banking day for the depositary bank, receipt of
notice on the depositary bank’s next banking day constitutes timely notice.  Notice
may be provided by any reasonable means, including the returned check, a
writing (including a copy of the check), telephone, Fedwire, telex, or other
form of telegraph.

 

Id.

          Each of the checks at issue exceeded
$2,500.  The court found that Wells Fargo Texas and Wells Fargo Ohio
“intentionally delayed giving notice of return.”  However, it is undisputed
that Wells Fargo Ohio gave notice of nonpayment within the time required by
Regulation CC, though it did not give notice as soon as it could have.  Because
Wells Fargo Ohio and Citizens Bank were dealing at arms length, Wells Fargo
Ohio did not act in bad faith by attempting to shift the loss to Citizens
Bank.  See Frost Natl. Bank, 241 F.3d at 874; First Natl. Bank in Harvey, 898 F. Supp. at 1231; Citizens Natl. Bank, 347 So. 2d at 969.

          Accordingly, Wells Fargo Ohio timely
returned the checks and timely gave notice of nonpayment.

          For the foregoing reasons, we sustain
Wells Fargo Texas’s third issue and overrule Citizens Bank’s sole cross-issue. 
We sustain Wells Fargo Texas’s second and fourth issues in part and overrule
them in part because of Wells Fargo Texas’s failure to timely forward the
fourth batch of checks.

Damages

          Wells Fargo Texas contends in its
fifth issue that there is no evidence or factually insufficient evidence to
support the court’s finding that Citizens Bank suffered damages from Wells
Fargo Texas’s breach of its duty of ordinary care.

          Section 4.103(e) provides:

                   The measure of damages for
failure to exercise ordinary care in handling an item is the amount of the item
reduced by an amount that could not have been realized by the exercise of
ordinary care.  If there is also bad faith, it includes any other damages the
party suffered as a proximate consequence.

 

Tex.
Bus. & Com. Code Ann. § 4.103(e)
(Vernon 2002).

          Here, we focus on only the batch of
checks which Wells Fargo Texas failed to timely deliver to the Federal Reserve
Bank.  Wells Fargo Texas should have delivered this batch to the Federal
Reserve Bank on Friday, March 29, but it delivered them a day late.  Despite
Wells Fargo Texas’s delay in delivering this batch of checks, it was still
presented to Wells Fargo Ohio on the next banking day, Monday, April 1.  As we
have held, Wells Fargo Ohio timely returned this batch of checks and gave
timely notice of nonpayment.

          Because the checks were presented to
Wells Fargo Ohio on the next banking day, the failure of Wells Fargo Texas to
deliver them to the Federal Reserve Bank until the Saturday following its
midnight deadline had no effect on the timing of Wells Fargo Ohio’s decision to
return them.  Stated another way, Citizens Bank could not have recovered the
sums represented by these checks even if Wells Fargo Texas had exercised
ordinary care and delivered them to the Federal Reserve Bank on Friday, March
29.  See id.; SCADIF, 208 F. Supp. 2d at 1376-77; Pulaski Bank
& Trust Co., 759 S.W.2d at 726.  Thus, we sustain Wells Fargo Texas’s
fifth issue.

Set-Off

          Wells Fargo Texas contends in its
sixth issue that the court erred in finding that:  (1) $892,333 garnished by
Citizens Bank from the Pate defendants’ account with Wells Fargo Texas under an
agreed order was only a conditional set-off against the judgment for failure to
timely return the checks; and (2) these garnished funds were not a set-off
against the alternative judgment.

          Because we will reverse and render a
take-nothing judgment in favor of Wells Fargo Texas, we need not address this
issue.

Conclusion

Wells Fargo Texas and Wells Fargo Ohio were
separate banks entitled to separate deadlines for processing checks.  The
correspondent banking relationship between Wells Fargo Texas and Citizens Bank
did not create a fiduciary relationship or otherwise impose a heightened duty
of care on Wells Fargo Texas.  Although Wells Fargo Texas did not timely
forward one batch of checks to the Federal Reserve Bank, Citizens Bank suffered
no damages as a result of this delay.  Wells Fargo Texas and Wells Fargo Ohio
otherwise timely processed the Pate defendants’ checks.  Accordingly, we reverse
the judgment and render judgment that Citizens Bank take nothing.

 

FELIPE REYNA

Justice

Before Chief Justice
Gray,

Justice
Vance, and

Justice
Reyna

Reversed and rendered

Opinion delivered and
filed September 7, 2005

[CV06]









[1]
          Checks written from a Wells
Fargo Texas account and presented to the same bank (other than “for immediate
payment over the counter”) would be treated as “on-us” items.  See Tex. Bus. & Com. Code Ann. §§
4.105(2), 4.302(a)(1) & cmt. 1 (Vernon 2002).  The U.C.C. requires more
expedited processing for “on-us” items.

 





[2]
              [C]heck kiting occurs when a “kite artist” uses
checks drawn on his or her account at one bank to cover checks written on his
or her account at another bank, and vice versa, so that a circle is created in
which no money is actually being deposited in either bank. Check kiting is
illegal, and it requires the grant of immediate credit from both banks on the
deposited checks from the other bank. Once one of the banks refuses to grant
immediate credit . . ., the kite collapses.

 

Tex. First
Natl. Bank v. Ng, 167 S.W.3d 842,
849 n.6 (Tex. App.—Houston [14th Dist.] 2005, no pet. h.).

 





[3]
              Citizens Bank would have lost about $2,000,000 even if it had
been able to return this additional $3,000,000 in checks.

 





[4]
          Citizens Bank makes similar
allegations against Wells Fargo Ohio, but we focus here on the allegations
against Wells Fargo Texas, the sole appellant.





[5]
          Because only “Wells Fargo Bank,
N.A., successor in interest to Wells Fargo Bank Texas, N.A.” perfected an
appeal, Citizens Bank contends that Wells Fargo Texas cannot complain of any
adverse findings regarding Wells Fargo Ohio.  We disagree.  The court’s primary
finding of liability focuses on the acts and omissions of Wells Fargo Texas
both alone and through Wells Fargo Ohio (for which the court held Wells Fargo
Texas liable under a single business enterprise theory).  The court’s
alternative finding, which assumes that Wells Fargo Texas and Wells Fargo Ohio
must be treated as separate legal entities, likewise holds Wells Fargo Texas
liable for the acts and omissions of Wells Fargo Ohio, this time under an
agency theory.  Because Wells Fargo Texas was held liable at least in part
because of the acts and omissions of Wells Fargo Ohio, we conclude that Wells
Fargo Texas may challenge any adverse findings regarding Wells Fargo Ohio.





[6]
          Controlled disbursement accounts
were devised in part because for-profit organizations are prohibited by statute
from earning interest on checking accounts (i.e. demand deposits).  See
12 U.S.C.A. § 1832(a)(2) (West 2001); Phillips v. Wash. Leg. Found., 524
 U.S. 156, 161, 118 S. Ct. 1925, 1928, 141 L. Ed. 2d 174 (1998); Paulsen v.
St. Bar of Tex., 55 S.W.3d 39, 42 (Tex. App.—Austin 2001, pet. denied).





[7]
          12 C.F.R. pt. 229 (collectively
referred to as “Regulation CC”) contains the regulations promulgated by the
Federal Reserve to implement the Expedited Funds Availability Act, 12 U.S.C.A.
§§ 4001-4010 (West 2001 & Supp. 2005).  NBT Bank, N.A. v. First Natl.
Community Bank, 393 F.3d 404, 410-11 (3d Cir. 2004).

 





[8]
          “MICR” stands for magnetic ink
character recognition.  IBP, Inc. v. Mercantile Bank of Topeka, 6 F.
Supp. 2d 1258, 1265 (D. Kan. 1998).  At the bottom of a check, “[t]he
MICR encoding consists of a check number, the payor bank’s American Bankers
Association transit routing number, and the drawer’s account number.”  Id.

 





[9]
          Unless otherwise indicated, the
term “section” as used hereinafter refers to a section of the Texas Business
and Commerce Code.

 





[10]
         The former section 1.201(7)
(which applies to this case) defined a “branch” to include “a separately
incorporated foreign branch of a bank.”  Business and Commerce Code, 60th Leg.,
R.S., ch. 785, § 1, sec. 1.201(7), 1967 Tex. Gen. Laws 2343, 2348 (amended
2003) (current version at Tex. Bus.
& Com. Code Ann. § 1.201(b)(7) (Vernon Supp. 2004–2005)).  The 2003
amendment only renumbered this statute.  Under this definition, Wells Fargo
Ohio would appear to qualify as a “branch” of Wells Fargo Texas.





[11]
         “‘Depositary bank’ means the
first bank to take an item even though it is also the payor bank, unless the
item is presented for immediate payment over the counter.”  Tex. Bus. & Com. Code Ann §
4.105(2) (Vernon 2002); see also 12 C.F.R. § 229.2(o) (2005) (“Depositary
bank means the first bank to which a check is transferred even though it is
also the paying bank or the payee.”).

            





[12]
         “‘Intermediary bank’ means a bank
to which an item is transferred in course of collection except the depositary
or payor bank.”  Id. § 4.105(4) (Vernon 2002).

            





[13]
         “‘Collecting bank’ means a bank
handling an item for collection except the payor bank.”  Id. § 4.105(5)
(Vernon 2002); see also 12 C.F.R. § 229.2(rr) (2005) (“Collecting bank
means any bank handling a check for forward collection, except the paying
bank.”).

            





[14]
         Regulation CC provides in
pertinent part that “a collecting bank handling a check for forward collection
may be liable to a prior collecting bank, including the depositary bank, and
the depositary bank’s customer.”  12 C.F.R. § 229.36(d) (2005).  However, the
Federal Reserve’s interpretive commentary explains that section 4.202 is “not
superseded” by Regulation CC and that section 4.202 “continue[s] to apply to
the forward collection of a check and may apply to the return of a check.”  Id. pt. 229, app. E, § XXII(D) (2005).  Thus, it does not appear that Regulation CC
imposes different obligations on a collecting bank than section 4.202 does.





[15]
         The 2003 amendment only
renumbered this statute.  Compare Tex.
Bus. & Com. Code Ann. § 1.304 (Vernon Supp. 2004–2005) with
Business and Commerce Code, 60th Leg., R.S., ch. 785, § 1, sec. 1.203, 1967
Tex. Gen. Laws 2343, 2352 (amended 2003).  Because the checks at issue were
processed in 2002, the amended version of the statute does not apply.





[16]
         It is true that Citizens Bank’s
allegations about the intent with which Wells Fargo Texas established the Pate
defendants’ controlled disbursement account (i.e., to create float and
delay payment of checks) could be characterized as “fraudulent” within the
general understanding of that term.  However, to establish that a bank owes a
heightened duty of care toward another bank because of fraud or
misrepresentation, we believe that it must be shown that the fraud or
misrepresentation was directed toward the other bank seeking to impose the
heightened duty of care.





[17]
         The omitted portions are
references to the record or to legal authorities.

 





[18]
            Wells Fargo Services Co. in Minnesota handled the return of checks
dishonored by Wells Fargo Ohio.